906 F.2d 432
 59 USLW 2025, 1990-1 Trade Cases 69,066,
30 Fed. R. Evid. Serv. 1069
 In re COORDINATED PRETRIAL PROCEEDINGS IN PETROLEUM PRODUCTS
ANTITRUST LITIGATION.
STATE OF ARIZONA, Plaintiff-Appellant,
v.
STANDARD OIL CO. OF CALIFORNIA; Texaco, Inc.; Union Oil
Co. of California; Atlantic Richfield Co.; Exxon
Corp.; Mobil Oil Corp.; and Shell Oil
Co., Defendants-Appellees,
and
Continental Oil Co.; Gulf Oil Corp.; Phillips Petroleum
Co.; Caribou Four Corners, Inc.; and Powerine
Oil Co., Defendants.
STATE OF CALIFORNIA, Plaintiff-Appellant,
v.
STANDARD OIL CO. OF CALIFORNIA; Texaco, Inc.; Union Oil
Co. of California; Exxon Corp.; Gulf Oil Corp.;
Mobil Oil Corp.; and Shell Oil Co.,
Defendants-Appellees,
and
Atlantic Richfield Co.; Getty Oil Co.; and Phillips
Petroleum Co., Defendants.
STATE OF OREGON, on behalf of itself, its residents and all
political subdivisions within the State similarly
situated, Plaintiff-Appellant,
v.
STANDARD OIL CO. OF CALIFORNIA; Texaco, Inc.; Union Oil
Co. of California; Atlantic Richfield Co.; Exxon
Corp.; Mobil Oil Corp.; and Shell Oil
Co., Defendants-Appellees,
and
Getty Oil Co.; Gulf Oil Corp.; and Phillips Petroleum Co.,
Defendants.
STATE OF WASHINGTON, on behalf of itself and its public
entities and residents, Plaintiff-Appellant,
v.
STANDARD OIL CO. OF CALIFORNIA; Texaco, Inc.; Union Oil
Co. of California; Atlantic Richfield Co.; Exxon
Corp.; Gulf Oil Corp.; Mobil Oil
Corp.; Shell Oil Co.,
Defendants-Appellees,
and
Getty Oil Co.; and Phillips Petroleum Co., Defendants.
 Nos. 86-6776, 86-6779, 86-6780, 86-6783 and 86-6784.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted July 15, 1988.
Decided June 22, 1990.
 
 Michael I. Spiegel, argued, Wayne M. Liao, Charles M. Kagay, Spiegel Liao & Kagay, San Francisco, Cal., Robert K. Corbin, Atty. Gen., Alison J. Butterfield, Chief Counsel, Antitrust Div., and Gary P. Brady, Asst. Atty. Gen., Phoenix, Ariz., for plaintiff-appellant State of Ariz.
 John K. Van De Kamp, Atty. Gen., Andrea Sheridan Ordin, Chief Asst. Atty. Gen., Sanford N. Gruskin, Asst. Atty. Gen., Thomas P. Dove, Lawrence R. Tapper, Mary Elizabeth Alden, and H. Chester Horn, Jr., Deputy Attys. Gen., Sacramento, Cal., for plaintiff-appellant State of Cal.
 Dave Frohnmayer, Atty. Gen., Michael D. Reynolds, David L. Slader, and Paul J. Sundermeier, Asst. Attys. Gen., Salem, Or., for plaintiff-appellant State of Or.
 Kenneth O. Eikenberry, Atty. Gen., and John R. Ellis, Deputy Atty. Gen., Seattle, Wash., for plaintiff-appellant State of Wash.
 Robert A. Mittelstaedt, argued, Roderick M. Thompson, and Craig E. Stewart, Pillsbury, Madison & Sutro, San Francisco, Cal., for defendant-appellee Chevron Corp. (formerly Standard Oil Co. of California).
 Otis Pratt Pearsall, Philip H. Curtis, Bruce R. Kelly, Hughes, Hubbard & Reed, New York City, Ronald C. Redcay, Hughes, Hubbard & Reed, Los Angeles, Cal., and Donald A. Bright, Los Angeles, Cal., for defendant-appellee Atlantic Richfield Co.
 Charles W. Matthews, Houston, Tex., Philip K. Verleger, and David A. Destino, McCutchen, Black, Verleger & Shea, Los Angeles, Cal., for defendant-appellee Exxon Corp.
 Harry P. Davis, Jr., Houston, Tex., for defendant-appellee Chevron Corp. (formerly Gulf Oil Corp.).
 Andrew J. Kilcarr, Maureen O'Bryon, Janet McDavid, Hogan & Hartson, Washington, D.C., and Charles F. Rice, New York City, for defendant-appellee Mobil Oil Corp.
 William R. O'Brien, Robert M. Bruskin, Howrey & Simon, Washington, D.C., and Raymond V. McCord, Los Angeles, Cal., for defendant-appellee Shell Oil Co.
 G. Kenneth Handley, Robert D. Wilson, White Plains, N.Y., and Leslie C. Randall, Universal City, Cal., for defendant-appellee Texaco Inc.
 Darryl Snider, Henry J. Kupperman, Scott P. Koepke, Brobeck, Phleger & Harrison, Los Angeles, Cal., William J. Taylor, Brobeck, Phleger & Harrison, San Francisco, Cal., Harold E. Zahner, and Robert G. Pott, Los Angeles, Cal., for defendant-appellee Union Oil Co. of California.
 Appeal from the United States District Court for the Central District of California.
 Before WALLACE, NELSON, and REINHARDT, Circuit Judges.
 NELSON, Circuit Judge:
 
 
 1
 The States of Arizona, California, Oregon, and Washington appeal from the district court's grant of summary judgment to the defendants in these consolidated antitrust actions. For the reasons stated below, we reverse the judgment of the district court and remand for further proceedings.
 
 I. INTRODUCTION
 
 2
 Between June 1975 and August 1977, the plaintiffs filed their complaints in these actions, alleging several violations of the Sherman Act, 15 U.S.C. Sec. 1 et seq. As developed during the subsequent pretrial proceedings, the plaintiffs' allegations fall into three categories. First, the plaintiffs allege that the defendant oil companies conspired to raise or stabilize prices for refined oil products in violation of Sec. 1 of the Sherman Act, 15 U.S.C. Sec. 1. The plaintiffs assert that, in furtherance of this conspiracy, the defendants continually engaged in the mutual exchange of pricing and price-related information. Second, the plaintiffs allege that the defendants conspired to create, by various means, an artificial scarcity of crude oil and refined oil products in the western United States, in violation of Secs. 1 & 2 of the Sherman Act, 15 U.S.C. Secs. 1 & 2. Third, the plaintiffs allege that the defendants conspired not to compete in bidding on the plaintiffs' annual bulk sale petroleum supply contracts, in violation of Sec. 1 of the Sherman Act.
 
 
 3
 After several years of extensive discovery, the plaintiffs filed in January 1983 a three volume pretrial brief ("Plaintiffs' Initial Pretrial Brief" or "PIPB"), setting out their analysis of what the evidence would prove. The PIPB was supplemented on several occasions. In July 1983, the defendants moved for summary judgment, asserting that the evidence as summarized in the PIPB failed to raise a triable issue of antitrust conspiracy. After three days of oral argument on the summary judgment motions, the district court took the matter under submission. On November 25, 1986, the court filed an opinion and order granting the defendants' summary judgment motion in its entirety. In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig., 656 F.Supp. 1296 (C.D.Cal.1986) [hereinafter Petroleum Prods.]. The plaintiffs have timely appealed.
 
 
 4
 Before turning to an analysis of the proper summary judgment standards and their application in this case, we think it appropriate and useful first to outline certain background facts concerning the industry's structure as well as the nature of appellants' theory concerning the operation of the alleged conspiracy.
 
 
 5
 The appellees are major oil companies which, among other activities, produce crude oil, refine it into gasoline, and sell the gasoline to various distributors. During the time periods relevant to this appeal, these distributors fell into roughly four classes: (1) independent service station owners who operated franchises selling one particular brand of gasoline; (2) company-owned service stations run by company employees; (3) independent "jobbers" or brokers who resold gasoline to various service stations and other purchasers; and (4) governmental entities and others who purchased under bulk sales contracts. All parties agree that the lion's share of appellees' gasoline that was sold at retail was sold by independent franchised service stations.
 
 
 6
 As franchisees, these "independent" dealers were not free to purchase their supply of gasoline from any oil company at any time; as long as they remained franchisees they could only purchase from their particular franchisor. Each company sold gasoline to its franchised dealers at a price known as the "dealer tankwagon price." In actuality, the official tankwagon prices were only occasionally changed; fluctuations in the cost of gasoline to franchised dealers were more frequently reflected in changes to the applicable discounts from the tankwagon price. These discounts were variously known as "temporary dealer assistance," "dealer aid," or simply "discounts."
 
 
 7
 The appellants argue that, as a consequence of this market structure, each oil company was effectively able to control the retail price at which its gasoline was sold. That is, the appellants claim that, although individual dealers "showed varying degrees of independence," an oil company could essentially determine the retail price by setting the applicable discount from the tankwagon price at which it sold gasoline to its franchised dealers.
 
 
 8
 In the present actions, the appellants claim that the appellees have engaged in a conspiracy to raise and stabilize the retail price of gasoline at the pump. They do not claim, however, that the appellees engaged in a resale price maintenance scheme whereby each dealer was required to charge a predetermined price; indeed, they have expressly disavowed such a theory. Rather, the appellants claim that the appellees conspired to fix retail prices by coordinating dealer discounts from the tankwagon price.
 
 
 9
 The parties hotly contest on appeal whether the application of this theory is limited by the Supreme Court's decision in Illinois Brick v. Illinois, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), which held that indirect purchasers of goods whose price was fixed earlier in the stream of commerce may not maintain an antitrust damages action for overcharges passed on to them by those who purchase directly from the pricefixers. Although the district court had earlier ruled that Illinois Brick limited the relief available to the plaintiffs, see In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig., 497 F.Supp. 218, 225-27 (C.D.Cal.1980), aff'd on other grounds, 691 F.2d 1335 (9th Cir.1982), cert. denied, 464 U.S. 1068, 104 S.Ct. 972, 79 L.Ed.2d 211 (1984), it nonetheless recognized that Illinois Brick did not completely bar recovery. Accordingly, in ruling on the summary judgment motion, the district court recognized that, despite the ruling that Illinois Brick limited the relief that was available, the plaintiffs would still be able to receive some relief if they could establish that the defendants conspired to fix retail prices by fixing wholesale prices. See Petroleum Prods., 656 F.Supp. at 1299 (noting that plaintiffs' theory was that the defendants conspiratorily eliminated dealer discounts, thus "restoring" the official tankwagon prices, in order to fix retail prices). For purposes of this appeal, we operate with this same premise. Accordingly, we have no occasion to consider whether the district court was correct in its earlier ruling concerning the applicability of Illinois Brick.
 
 II. SUMMARY JUDGMENT STANDARDS
 
 10
 We review de novo the district court's grant of summary judgment to the defendants. Richards v. Neilsen Freight Lines, 810 F.2d 898, 902 (9th Cir.1987).
 
 
 11
 Determining whether the grant of summary judgment was proper in this case involves a careful application of the standards set down by the Supreme Court in Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Because the parties sharply disagree over the proper interpretation of Matsushita, and because the issue is crucial to a proper resolution of this case, we think it appropriate to review in some detail the nature of the standards established in Matsushita.
 
 A. The Matsushita Decision
 
 12
 In Matsushita, plaintiffs Zenith and National Union Electric Corp. ("Zenith") sued several Japanese companies that manufacture consumer electronic products. Zenith alleged that the Japanese companies had engaged in a predatory pricing conspiracy aimed at driving American firms from the U.S. consumer electronic products market. After several years of discovery, the defendants moved for summary judgment. The district court granted the defendants' motion, concluding that any inference of conspiracy was unreasonable. Zenith Radio Corp. v. Matsushita Elec. Indus. Co., 513 F.Supp. 1100 (E.D.Pa.1981). The Third Circuit reversed as to 21 of the 24 defendants, concluding that the plaintiffs had presented sufficient evidence to permit a reasonable factfinder to infer that the defendants had engaged in a predatory pricing conspiracy. In re Japanese Elec. Prods. Antitrust Litig., 723 F.2d 238, 304-11 (3d Cir.1983).
 
 
 13
 The Supreme Court reversed this decision because it concluded that the evidence proffered by the plaintiffs did not provide any basis for concluding that the alleged predatory pricing was rational; in the Court's words, the defendants simply "had no rational economic motive to conspire." Matsushita, 475 U.S. at 596, 106 S.Ct. at 1361. This fact, combined with the evidence that the defendants' conduct was "consistent with other, equally plausible [innocent] explanations" implied that the defendants' conduct could "not give rise to an inference of conspiracy." Id. at 596-97, 106 S.Ct. at 1361. Moreover, the Court stated that, even if the defendants had had a rational economic motive to conspire, summary judgment would still have been appropriate in light of the fact that "conduct that is as consistent with permissible competition as with illegal conspiracy does not, without more, support even an inference of conspiracy." Id. at 597 n. 21, 106 S.Ct. at 1362 n. 21 (citing Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 763-64, 104 S.Ct. 1464, 1470-71, 79 L.Ed.2d 775 (1984)). In such circumstances, the plaintiff must come forward with "sufficiently unambiguous" evidence " 'that tends to exclude the possibility' " that the defendants were acting lawfully. Id. 475 U.S. at 588, 597, 106 S.Ct. at 1356, 1362 (quoting Monsanto, 465 U.S. at 764, 104 S.Ct. at 1471).
 
 
 14
 We do not take these latter comments as suggesting that a district court may grant summary judgment to antitrust defendants whenever the court concludes that inferences of conspiracy and inferences of innocent conduct are equally plausible. Allowing the district court to make that decision would lead to a dramatic judicial encroachment on the province of the jury. To read Matsushita as requiring judges to ask whether the circumstantial evidence is more "consistent" with the defendants' theory than with the plaintiff's theory would imply that the jury should be permitted to choose an inference of conspiracy only if the judge has first decided that he would himself draw that inference. This approach would essentially convert the judge into a thirteenth juror, who must be persuaded before an antitrust violation may be found.
 
 
 15
 Indeed, under this interpretation of Matsushita, a trial judge would not even need to evaluate whether the inference of conspiracy meets a threshold standard of reasonableness, which is the usual standard for judging inferences on summary judgment. See Batchelor v. Oak Hill Medical Group, 870 F.2d 1446, 1447 (9th Cir.1989). Since any inference that the trial judge thinks is more plausible than its alternatives must necessarily be a reasonable one, the trial judge would only need to ask whether he thinks the inference of conspiracy is the more plausible one. This cannot be what the Supreme Court meant when it stated that "antitrust law limits the range of permissible inferences from ambiguous evidence in a Sec. 1 case." Matsushita, 475 U.S. at 588, 106 S.Ct. at 1356. The Court purported to limit the application of the traditional summary judgment rules in the antitrust context; it did not intend to abolish them and replace them with an entirely different set, one which raises troubling seventh amendment concerns. Cf. Standard Oil v. Arizona, 738 F.2d 1021 (9th Cir.1984) (holding, in a prior appeal in this case, that the seventh amendment guarantees a right to jury trial in antitrust cases), cert. denied, 469 U.S. 1132, 105 S.Ct. 815, 83 L.Ed.2d 807 (1985). Indeed, the Court noted that, within the limits imposed by antitrust law, it remained true that " '[o]n summary judgment the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion.' " Matsushita, 475 U.S. at 587-88, 106 S.Ct. at 1356 (quoting United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)).
 
 
 16
 Nor do we think that Matsushita and Monsanto can be read as authorizing a court to award summary judgment to antitrust defendants whenever the evidence is plausibly consistent with both inferences of conspiracy and inferences of innocent conduct. Such an approach would imply that circumstantial evidence alone would rarely be sufficient to withstand summary judgment in an antitrust conspiracy case. After all, circumstantial evidence is nearly always evidence that is plausibly consistent with competing inferences. See United States v. Henderson, 693 F.2d 1028, 1031 (11th Cir.1982) ("[C]ircumstantial evidence is not testimony to the specific fact being asserted, but testimony to other facts and circumstances from which the jury may infer that the fact being asserted does or does not exist."). Thus, such an interpretation of Matsushita would seem to be tantamount to requiring direct evidence of conspiracy. This cannot be what the Court meant in Matsushita. Since direct evidence will rarely be available, such a reading would seriously undercut the effectiveness of the antitrust laws. Furthermore, Monsanto itself clearly indicates that circumstantial evidence may be sufficiently unambiguous to survive summary judgment. Monsanto, 465 U.S. at 764, 104 S.Ct. at 1471 (plaintiff must "present direct or circumstantial evidence" that reasonably tends to prove that the defendants were engaged in a conspiracy rather than acting independently) (emphasis added); see also Harkins Amusement Enterprises, Inc. v. General Cinema Corp., 850 F.2d 477, 485 (9th Cir.1988) (circumstantial evidence found to be sufficiently unambiguous under Monsanto ), cert. denied, 488 U.S. 1019, 109 S.Ct. 817, 102 L.Ed.2d 806 (1989).
 
 
 17
 We think that the key to the proper interpretation of Matsushita lies in the Court's emphasis on the dangers of permitting inferences from certain types of ambiguous evidence. In Matsushita, the Court was unwilling to permit an inference of predatory pricing in part because the Court was concerned about the inference's possible anticompetitive side-effects. The Court noted that the plaintiffs attempted to prove an antitrust conspiracy "through evidence of rebates and other price-cutting activities." 475 U.S. at 594, 106 S.Ct. at 1360. However, as the Court went on to observe,
 
 
 18
 "[C]utting prices in order to increase business often is the very essence of competition. Thus, mistaken inferences in cases such as this one are especially costly, because they chill the very conduct the anti-trust laws are designed to protect. See Monsanto, [465 U.S.] at 763-764 [104 S.Ct. at 1470-1471]. '[W]e must be concerned lest a rule or precedent that authorizes a search for a particular type of undesirable pricing behavior end up by discouraging legitimate price competition.' "
 
 
 19
 Id. (quoting Barry Wright Corp. v. ITT Grinnell Corp., 724 F.2d 227, 234 (1st Cir.1983)).
 
 
 20
 Thus, Matsushita establishes that a trial judge should not permit an inference of antitrust conspiracy from circumstantial evidence where to do so would have the effect of deterring significant procompetitive conduct. We emphasize, however, that an antitrust defendant is not entitled to summary judgment simply by virtue of the fact that the plaintiff's inference of conspiracy would have some deterrent effects; the effects must be significant. As the Court stated in Matsushita, the concern with avoiding deterrent effects "must be balanced against the desire that illegal conspiracies be identified and punished." 475 U.S. at 594, 106 S.Ct. at 1360. In short, the trial court must consider whether, on the evidence presented, the protection of innocent independent conduct outweighs the costs associated with the potential decrease in strict antitrust enforcement. If it does, then the plaintiff must come forward with additional, "sufficiently unambiguous" evidence that does not have these undesirable deterrent effects. Id. at 597-98 & n. 21, 106 S.Ct. at 1361-62 & n. 21.
 
 
 21
 This reading of Matsushita is further supported by examining the Court's decision in Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), upon which the Matsushita Court relied heavily. In Monsanto, plaintiff Spray-Rite alleged that Monsanto had illegally conspired with its other distributors in deciding to terminate Spray-Rite's distributorship. Among the items of evidence introduced in support of this claim was the fact that Monsanto terminated Spray-Rite after receiving complaints from its other distributors about Spray-Rite's price cutting practices. Monsanto, on the other hand, contended that it had acted independently in deciding to terminate Spray-Rite. In analyzing the proper standard of proof for such a claim, the Supreme Court began by noting that, while it is per se illegal for a manufacturer to get together with its distributors and agree on prices, see Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 404-09, 31 S.Ct. 376, 383-85, 55 L.Ed. 502 (1911), it is nonetheless permissible for a manufacturer to announce its retail prices in advance and then to terminate those distributors who fail to comply, see United States v. Colgate & Co., 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919). See Monsanto, 465 U.S. at 761, 104 S.Ct. at 1469. In light of these cases, the Court concluded that it could not permit an inference of conspiracy to be drawn from the mere fact that a distributor had been terminated after the manufacturer had received complaints from other distributors about price cutting. The Court reasoned that permitting such an inference would effectively preclude a manufacturer from exercising its independent termination rights under Colgate once it received any complaints from its distributors. In the Court's words:
 
 
 22
 Permitting an agreement to be inferred merely from the existence of complaints, or even from the fact that termination came about "in response to" complaints, could deter or penalize perfectly legitimate conduct.... To bar a manufacturer from acting solely because the information upon which it acts originated as a price complaint would create an irrational dislocation in the market. In sum, "[t]o permit the inference of concerted action on the basis of receiving complaints alone and thus to expose the defendant to treble damage liability would ... inhibit management's exercise of its independent business judgment...."
 
 
 23
 Monsanto, 465 U.S. at 763-64, 104 S.Ct. at 1470-71 (quoting Edward J. Sweeney & Sons, Inc. v. Texaco, Inc., 637 F.2d 105, 111 n. 2 (3d Cir.1980), cert. denied, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981)) (other citations omitted).
 
 
 24
 Monsanto thus clearly illustrates that courts should be careful not to permit inferences of antitrust conspiracy when to do so would create a significant irrational dislocation in the market or would result in significant anticompetitive effects.[1]
 
 
 25
 In summary, we conclude that where an antitrust plaintiff relies entirely upon circumstantial evidence of conspiracy, a defendant will be entitled to summary judgment if it can be shown that (1) the defendant's conduct is consistent with other plausible explanations, and (2) permitting an inference of conspiracy would pose a significant deterrent to beneficial procompetitive behavior. Once the defendant has made such a showing, the plaintiff must come forward with other evidence that is sufficiently unambiguous and tends to exclude the possibility that the defendant acted lawfully.
 
 B. Direct v. Circumstantial Evidence
 
 26
 Before turning to the specific issues of this case, we must add one further comment with regard to the applicability of Matsushita. As the above analysis demonstrates, the concerns highlighted in Matsushita and Monsanto arise only in the context of whether to permit inferences from circumstantial evidence. Accordingly, the Matsushita standards do not apply when the plaintiff has offered direct evidence of conspiracy.
 
 
 27
 This important limitation on the applicability of Matsushita was emphasized in our decision in McLaughlin v. Liu, 849 F.2d 1205 (9th Cir.1988). In Liu, the Secretary of Labor argued that summary judgment was properly granted, under Matsushita, on the grounds that the defendant's sworn affidavit--which, if believed, would have provided a complete defense as to part of the Secretary's claim--was "implausible." Id. at 1207. We emphatically rejected this argument, noting that in Matsushita, "the Court was not speaking of direct evidence, but of circumstantial evidence." Id. We noted the important difference between circumstantial evidence, in which a party asks that certain "inferences be drawn in his favor" and direct evidence, where, in order to defeat a request for summary judgment, the nonmovant need only ask that his evidence "be taken as true." Id. at 1208. We emphasized that the cases of both the Supreme Court and this court "have honored the difference between weighing direct evidence and refusing to draw unreasonable inferences from circumstantial evidence." Id. We summarized our cases as indicating that Matsushita only applies "where the non-movant relie[s] on inferences from circumstantial evidence." Id. We then went on to quote extensively from T.W. Electrical Services, Inc. v. Pacific Electrical Contractors Assoc., 809 F.2d 626 (9th Cir.1987), highlighting that the Matsushita inquiry was appropriate only " '[w]here there is no direct evidence of a conspiracy.' " Id. at 1209 (quoting T.W. Elec., 809 F.2d at 632) (emphasis added by Liu). See also Christofferson Dairy, Inc. v. MMM Sales, Inc., 849 F.2d 1168, 1172 n. 4 (9th Cir.1988) (standards spelled out in T.W. Elec. apply only "[i]f there is no direct evidence of a conspiracy").
 
 
 28
 Thus, in applying Matsushita, a court must consider the nature of the evidence that the plaintiffs have offered with respect to each element of the cause of action. If the plaintiffs rely exclusively on circumstantial evidence in order to establish at least one element of their cause of action, then the court must proceed to analyze, under Matsushita, whether the inferences which the plaintiffs seek to draw from the indirect evidence are reasonable and permissible under the governing substantive law. T.W. Elec., 809 F.2d at 631; see also United Steelworkers of America v. Phelps Dodge Corp., 865 F.2d 1539, 1542 (9th Cir.) (en banc), cert. denied, --- U.S. ----, 110 S.Ct. 51, 107 L.Ed.2d 20 (1989). In the antitrust field, this inquiry will be guided by the principles outlined earlier. If, however, the plaintiffs offer direct evidence to support each element, then summary judgment must be denied.
 
 III. APPELLANTS' PRICE-FIXING CLAIMS
 
 29
 In their briefs to this court, the appellants have identified three classes of evidence that they claim create a genuine issue of material fact as to whether the appellees were engaged in a conspiracy to fix or stabilize prices. For purposes of analysis, we will first examine these classes of evidence successively; having done so, we will then be in a better position to evaluate the probative value of the entirety of the appellants' evidence.
 
 A. Pricing Pattern Evidence
 
 30
 The first set of evidence that the appellants claim indicates the existence of a conspiracy is a set of analyses of the appellees' pricing patterns.[2] This analysis was performed by appellants' expert Keith Leffler. The raw data which Mr. Leffler analyzed were derived, in large measure, from pricing information collected by Lundberg Surveys, Inc. During the period from 1968 to 1973, the Lundberg firm collected, on a weekly basis, retail price information from individual stations in 14 different cities in Arizona, California, Oregon, and Washington. Mr. Leffler analyzed this data for the largest city in each of the four states. His analysis of this weekly price data indicates that, between 1968 and August 1972, the average retail prices of stations selling appellees' gasoline in the Los Angeles, Phoenix, Portland, and Seattle markets generally followed a "sawtooth" pattern. That is, the average prices would generally decline over a period of time ranging from approximately three to eleven weeks, and then the prices would return to roughly their original, higher levels over approximately a one to four week period. Both the price increases and decreases from week to week were often quite sharp; but the increases were often especially sharp.
 
 
 31
 The parties do not seriously dispute that the sharp increases in retail prices were generally the consequence of the withdrawal of dealer discounts, thus resulting in the "restoration" of the "normal" higher dealer tankwagon prices.[3] Accordingly, we cannot accept the district court's conclusion that the cyclical pattern of retail prices does not suggest that wholesale prices followed a similar pattern. See Petroleum Prods., 656 F.Supp. at 1300 ("the cycle of retail price changes reflected by the charts does not establish that the defendants' wholesale prices followed the same pattern").[4] Indeed, we note that the data presented by the appellees themselves concerning their wholesale prices indicates that the pattern of these prices was a cyclical one of sharp increases followed by gradual declines. The key disagreement between the parties concerns the significance of this pattern. The appellees argue that the restorations and the sawtooth pattern of prices do not indicate conspiracy because the same pattern would be produced by individual companies each deciding to follow the others' price lead. In short, the appellees essentially assert that their pricing behavior was interdependent rather than conspiratorial.[5] The appellants disagree, arguing that these price cycles were not the result of any sort of independent action, but are rather an indication of collusion. The appellants assert that a conspiracy may be inferred from this pricing data because the price increases were too large and too risky to have occurred in a competitive market. According to the appellants, any company that raised its prices this sharply would so risk losing business that it would never take such a step without some advance assurance that others would follow. Therefore, argue the appellants, the fact that such price increases were made is an indication of a prior agreement to raise prices.
 
 
 32
 In applying Matsushita, our first task is to decide whether the appellees' claim of interdependent pricing constitutes a sufficiently plausible independent explanation for their pricing behavior. The appellants' key argument on this score is that the price increases were so risky that it is implausible to believe that any firm would have undertaken them without some advance agreement from competitors. We note that such an argument may often be valid when the relevant market is highly unconcentrated or where the increase cannot be reversed easily or readily without substantial loss of goodwill. See VI P. Areeda, Antitrust Law p 1425d at 150-53, p 1431a at 183-84 (1986). In a highly unconcentrated market, any firm that attempted a unilateral supracompetitive price increase would quickly lose business to its many other competitors. Interdependent pricing is not likely to occur because each firm realizes that the possibility of undetected "shading" of the interdependent price by a single firm would quickly lead to a return to the original market price. Turner, The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal, 75 Harv.L.Rev. 655, 659-60 (1962); see also VI P. Areeda, supra, at p 1429a. In such a market, any single firm can increase its output without substantially affecting the market price or the market shares of its competitors. This fact substantially increases the odds that shading by an individual firm would either go undetected or be ignored, and the consequent spread of such discounting would rapidly bring the overall price back down. Turner, 75 Harv.L.Rev. at 660; VI P. Areeda, supra, at p 1429a. Therefore, without some sort of prior agreement prohibiting such shading, the temptation for any individual firm would be almost irresistible. Turner, 75 Harv.L.Rev. at 660. Accordingly, in highly unconcentrated markets, a claim that price increases were the result of sequential interdependent price increases is often likely to prove implausible.
 
 
 33
 However, as the number of firms in a market declines, the possibilities for interdependent pricing increase substantially. In determining whether to follow a unilateral price increase by a competitor, a firm in a relatively concentrated market will recognize that, because its pricing and output decisions have an effect on market conditions and will generally be watched by its competitors, there is less likelihood that any shading would go undetected or would be ignored. The firm thus knows that if it fails to follow the price lead, the leading firm will quickly reduce its prices back to their earlier level. VI P. Areeda, supra, at p 1429b. On the other hand, the firm may recognize that the higher price is one that would produce higher profits. It may therefore decide to follow the price increase, knowing that the other firms will likely see things the same way and that, at any rate, any subsequent downward movement in prices would likely be detected before there was any substantial loss of market share. Id.; Turner, 75 Harv.L.Rev. at 661-62.
 
 
 34
 There has been a considerable debate in the literature over whether interdependent pricing is an inevitable or inherent feature of certain types of concentrated markets. Compare VI P. Areeda, supra, at pp 1430-32 (inherent); Sullivan, The Viability of the Current Law on Horizontal Restraints, 75 Cal.L.Rev. 835, 858-59 (1987); Turner, 75 Harv.L.Rev. at 665-66 with R. Posner, Antitrust Law: An Economic Perspective 42-47 (1976) (not inherent); Posner, Oligopoly and the Antitrust Laws: A Suggested Approach, 21 Stan.L.Rev. 1562, 1566-75 (1969). We need not take any side in this debate.[6] Regardless of whether such conduct is an inevitable consequence of a more concentrated market structure, we conclude that it is at least plausible to assert that such pricing behavior can occur when the number of significant rivals in a market is sufficiently small.
 
 
 35
 We do not think that the number of significant firms in the gasoline markets involved in this case is so large as to render the possibility of sequential interdependent price increases wholly implausible. Although these markets would probably not be considered highly concentrated in Herfindahl-Hirschmann terms, that does not imply that the appellees' claim of interdependent pricing is implausible. VI P. Areeda, supra, p 1431a at 183 (noting that the Herfindahl-Hirschmann Index "cannot capture the full range of factors bearing upon the existence or strength of recognized interdependence"). As Professor Areeda has noted, "All one can say with assurance is that such interdependence and price coordination are implausible when there are 'many' 'significant' rivals (more than a dozen?) but more likely as the number of firms decreases." Id. at 184. The gasoline markets under discussion here appear to lie in that gray area where, although not altogether inevitable, interdependence is distinctly possible. See F. Scherer, Industrial Market Structure and Economic Performance 288 (2d ed. 1980) (discussing empirical evidence of interdependent pricing in the gasoline industry). Indeed, the appellants have not pointed to any evidence indicating that the number of firms in these markets is too large for interdependence to occur.
 
 
 36
 Nonetheless, we noted earlier that, even in highly concentrated markets, a unilateral price hike might be too risky to make without advance agreement if the increase could not be readily reversed without a significant loss of goodwill. On the other hand, where a unilateral price increase can be withdrawn quickly, a firm may very well decide to test the waters without any sort of advance commitment from its competitors as to whether they will follow. In this regard, we note that the uncontested record evidence indicates that unilateral price increases in these markets were quickly reversible.[7] Furthermore, the evidence indicates that, although unilateral restorations could often entail significant costs if unsuccessful, the costs do not appear to have been so prohibitive as to suggest that the possibility of such unilateral action was implausible.[8]
 
 
 37
 We recognize that such interdependent pricing may often produce economic consequences that are comparable to those of classic cartels. Nonetheless, proof of such pricing, standing alone, is generally considered insufficient to establish a violation of the Sherman Act. See Wilcox v. First Interstate Bank of Oregon, N.A., 815 F.2d 522, 526 (9th Cir.1977) ("[T]he fact that competitors may see proper, in the exercise of their own judgment, to follow the prices of another manufacturer, does not establish any suppression of competition or show any sinister domination.") (quoting United States v. International Harvester Co., 274 U.S. 693, 708-09, 47 S.Ct. 748, 754, 71 L.Ed. 1302 (1927)); see also Clamp-All Corp. v. Cast Iron Soil Pipe Inst., 851 F.2d 478, 484 (1st Cir.1988), cert. denied, 488 U.S. 1007, 109 S.Ct. 789, 102 L.Ed.2d 780 (1989); Apex Oil Co. v. DiMauro, 822 F.2d 246, 253-54 (2d Cir.), cert. denied, 484 U.S. 977, 108 S.Ct. 489, 98 L.Ed.2d 487 (1987); E.I. DuPont de Nemours & Co. v. F.T.C., 729 F.2d 128, 139 (2d Cir.1984) ("The mere existence of an oligopolistic market structure in which a small group of manufacturers engage in consciously parallel pricing of an identical product does not violate the antitrust laws."); VI P. Areeda, supra, at p 1432; Turner, 75 Harv.L.Rev. at 669-72. Additional proof beyond mere parallel pricing usually is required.[9]
 
 
 38
 Our discussion of Matsushita highlights the wisdom of this rule. In applying the second prong of the Matsushita test, we must ask whether, given the possibly interdependent nature of the pricing behavior observed in this case, permitting a Sec. 1 violation to be found solely on such evidence would have the effect of deterring important legitimate conduct. We conclude that, if we were required to decide based on the price cycle evidence standing alone, we would find that it would not be enough to survive summary judgment. To permit an antitrust violation to be based on the sawtooth price pattern in this case, without more, would require a company making wholly independent pricing decisions to consider that the possible responses of its competitors might render it liable for treble damages. Similarly, following another company's price increase might very well provide the evidence that a disgruntled customer would need to get to a jury in a treble damage antitrust suit. It thus appears that permitting an inference of conspiracy from the parallel pricing evidence alone would result in an anticompetitive dislocation by distorting independent pricing decisions.
 
 
 39
 We also cannot agree that, without more, the conspiratorial nature of the price restorations is indicated by the fact that the price hikes were "too high." Were we to permit such a theory, few pricing decisions would be immune from antitrust scrutiny. Any unhappy buyer in a market experiencing a general increase in prices could bring an antitrust action against the sellers, arguing that the conspiratorial nature of the price increase is indicated by the fact that the increase was "too high." The court would then be required to receive evidence as to the wisdom of, and necessity for, the price increase, and to judge what constitutes a "fair" price. The federal courts generally are unsuited to act as rate-setting commissions. See VI P. Areeda p 1432 at 203. Accordingly, the appellants must rely on additional evidence beyond mere price parallelism in order to avoid summary judgment.
 
 B. Price Data Dissemination Evidence
 
 40
 The appellants point to two additional classes of evidence which they claim indicate the existence of a conspiracy to fix or stabilize prices. The first of these two sets consists of evidence concerning various practices whereby the appellees disseminated information concerning their wholesale and retail prices. The appellants contend that, not only were these price dissemination practices themselves conspiratorily and unlawfully adopted, but that they were adopted pursuant to an agreement or understanding to engage in concerted restorations. The appellees argue that these practices were both lawful and independently adopted and that they are not probative of a conspiracy to stabilize prices.
 
 1. Press releases
 
 41
 The appellants presented evidence indicating that at various times each of the defendants except ARCO, Union, and Gulf engaged in the practice of publicly announcing, in press releases, their decisions to withdraw dealer assistance and to restore tankwagon prices.[10] Indeed, the evidence indicates that such price increases were sometimes announced in advance of their effective date. Thus, for example, Mobil announced on March 26, 1970 that it would withdraw dealer aid effective March 30. The appellees argue that no inference of conspiracy may be drawn from such evidence because they claim that the publication of this information was "perfectly lawful" and an "ordinary business practice." We conclude, however, that such an inference is both reasonable and permissible under Matsushita.
 
 
 42
 In their depositions in this case, several officers of the appellee oil companies were questioned concerning the business reasons for publicly announcing changes in tankwagon prices and in the levels of dealer assistance. Their virtually uniform response was that it was done for the purpose of quickly informing competitors of the price change, in the express hope that these competitors would follow the move and restore their prices.
 
 
 43
 Thus, the appellees' officers' own testimony indicates that there was essentially no purpose for publicly announcing tankwagon prices and dealer discount information other than to facilitate either interdependent or plainly collusive price coordination. Announcing such price increases publicly reduced the likelihood that the increase would fail to be detected or that it would be detected only after the price leader had been "hung out to dry" in the market for several days. Without a press release, a withdrawal of dealer support might not be readily detected because the retail prices of individual branded gas stations varied considerably. As one Standard Oil official put it: "[S]treet pricing [was] all over the lot; so to us it was important that we set forth clearly and exactly what we had done so there would be no misunderstanding of it." Indeed, ARCO's failure publicly to announce its restoration attempts to the trade press appears to have been responsible for the failure of its January 1970 restoration. An internal ARCO memorandum explained that "[t]he reason this partial restoration did not work is that our competitors obviously thought our dealers were merely overpricing and our constructive efforts went completely unnoticed at the market place." To avoid this problem, the memorandum recommended that if ARCO decided to lead a restoration in the future, it should be "telegraphed to all news media as far as possible in advance as Legal will approve."
 
 
 44
 It was important for the appellees to reduce the uncertainties concerning restorations because the costs associated with leading a restoration were significant, and they increased with each day that a move was not detected or was not followed. An internal ARCO memorandum noted that its unsuccessful restoration attempts had been "costly to us, not only in terms of volume, but more importantly in expense dollars required to recoup and serious adverse reaction with our customers and in our dealer organization." Another ARCO document noted that "[p]ast experience has taught us how disastrous it can be for us to be the leader in an upward move." Even with public announcement, the costs of leading a restoration were substantial; Standard Oil's internal analysis of the effect of three restorations it led indicated an average drop in sales volume of over 19% within one week. The same Standard Oil document blamed, in part, the company's practice of leading restorations for causing a significant decline in Standard's overall market share. An ARCO document echoed this view, noting that Standard's and Shell's leading of restorations had led to their "disastrous" loss in market share.
 
 
 45
 The evidence presented by the appellants thus indicates that the publication of wholesale price increases was intended to make, and had the effect of making, restorations more effective by ensuring that competitors could quickly learn of, and respond to, any withdrawal of dealer aid.[11] The appellees' actions in announcing such information made the market more receptive to price coordination than it otherwise would have been. Although we concluded earlier that mere proof of interdependent pricing, standing alone, may not serve as proof of an antitrust violation, we believe that the evidence concerning the purpose and effect of price announcements, when considered together with the evidence concerning the parallel pattern of price restorations, is sufficient to support a reasonable and permissible inference of an agreement, whether express or tacit, to raise or stabilize prices. The inference is reasonable because at the very least, a jury could conclude that the appellees implicitly agreed to engage in practices that they knew and hoped would lead to greater price coordination,[12] with the result that when a price leader wished to initiate a restoration, it could effectively solicit tacit agreement. See United States v. Container Corp., 393 U.S. 333, 336-37, 89 S.Ct. 510, 512, 21 L.Ed.2d 526 (1969) (informal agreement to provide price information may, under appropriate market conditions, constitute circumstantial evidence of an agreement to stabilize prices);[13] King & King Enterprises v. Champlin Petroleum Co., 657 F.2d 1147, 1152 (10th Cir.1981) (Container established that exchange of price information may serve as basis for inferring price fixing where effect of such exchange is to stabilize prices), cert. denied, 454 U.S. 1164, 102 S.Ct. 1038, 71 L.Ed.2d 320 (1982); Penne v. Greater Minneapolis Area Bd. of Realtors, 604 F.2d 1143, 1148-49 (8th Cir.1979) (summary judgment was erroneously granted where evidence indicated possible connection between price information exchanges and alleged conspiracy to fix brokerage fees); see also Posner, Information and Antitrust: Reflections on the Gypsum and Engineers Decisions, 67 Geo.L.J. 1187, 1199 (1979) ("[I]f the effect of the information exchange were to raise the level [of] prices, one could infer that the motive was price fixing."); id. at 1203 (a jury should be allowed "to consider exchanges of information, other communications among the parties to an alleged conspiracy, and such other relevant circumstances as the effect on the price level ..., as circumstantial evidence of alleged price fixing.").
 
 
 46
 We reject the appellees' circular argument that the publication of dealer discount and price information cannot support an inference of conspiracy because the information was "publicly available." The information was publicly available only because the appellees chose to make it so; without such dissemination, price moves were not always readily and easily detected. Furthermore, we agree with Professor (now Judge) Posner that "the form of the exchange--whether through a trade association, through private exchange as in Container, or through public announcements of price changes--should not be determinative of its legality." R. Posner, Antitrust Law: An Economic Perspective 146 (1976). The fact that it is feasible for the appellees to communicate the necessary price information through press releases does not "immunize the exchange of price information from legal sanction [where] the conditions of the market suggest that the exchange promotes collusive rather than competitive pricing." Id. at 147.
 
 
 47
 We do not believe that permitting such an inference poses any problem under Matsushita. The district court concluded that the inference could not be permitted, reasoning that the hope of imitation was a proper business purpose for the announcements, and that the publication of such information was in the legitimate individual interest of each company. Petroleum Prods., 656 F.Supp. at 1304-05. We agree that it is plausible to contend that independent considerations of self-interest would have led a company to choose to publish a price increase that it had decided to make. That does not settle the inquiry, however; the question remains whether permitting an inference of conspiracy from the fact of such publication would significantly deter important legitimate conduct. Given the market conditions present in this case, we conclude that it would not.
 
 
 48
 It is important to recognize that, given the system of branded franchising, the tankwagon prices or dealer discounts are not of immediate significance to anyone other than the oil companies and their franchised dealers. Retail purchasers do not care what the dealer paid for the oil; they are concerned only with the price at the pump. Moreover, the public dissemination of information concerning dealer tankwagons and discounts could hardly be described as fostering the efficient or rational operation of the market inasmuch as there simply was no wholesale market to rationalize; the branded dealers were not free to shop around for their oil. Accordingly, the district court's reliance on Maple Flooring Mfrs. Ass'n v. United States, 268 U.S. 563, 582-84, 45 S.Ct. 578, 584-85, 69 L.Ed. 1093 (1925) (noting that certain types of price information exchanges may help to "avoid the waste which inevitably attends the unintelligent conduct of economic enterprise"), quoted in Petroleum Prods., 656 F.Supp. at 1304, is wholly inapposite.
 
 
 49
 The uncontested record evidence indicates that the dealers were individually notified concerning any changes in the tankwagon price or in the level of dealer discount. In light of this fact, it appears that the public dissemination of such information served little purpose other than to facilitate interdependent or collusive price coordination. Under these circumstances, there is no significant probability that permitting the proffered inference would deter important legitimate conduct.[14] The Matsushita balance is particularly one-sided in this case.
 
 
 50
 Nothing in our earlier discussion concerning mere proof of parallel pricing is to the contrary. Simple interdependent pricing does not violate the Sherman Act, not because it is desirable (it is not), but because permitting proof of conspiracy solely on the basis of price parallelism is undesirable. The appellants, however, have offered evidence indicating that the appellees in this case did more than simply price interdependently. A jury could conclude that the oil companies agreed, either implicitly or explicitly, to create market conditions that would facilitate tacit or express price coordination. The evidence would support a conclusion that the appellees strove to make such coordination possible where it otherwise might not have been. To paraphrase Professor Areeda, "One may reluctantly tolerate interdependent pricing behavior as such and still condemn [those agreements involving] practices which unjustifiably facilitate interdependent pricing and which can be readily identified and enjoined." P. Areeda, Antitrust Analysis p 325, at 381 (3d ed. 1981). We think that a jury should decide whether the appellees' actions were undertaken pursuant to an agreement or understanding concerning prices or whether their activities were simply noncollusive and independent.[15]
 
 2. Posting of prices
 
 51
 The appellants also presented evidence indicating that several of the appellees publicly posted their dealer tankwagon prices and any applicable dealer discounts. Specifically, the appellants produced evidence indicating that Mobil, Standard Oil, and Exxon posted such information, for public inspection, at either their company headquarters, division offices, or bulk plants. The appellants also presented testimony from an ARCO executive to the effect that ARCO "probably" posted its tankwagon prices at its bulk plants. In addition, there is evidence in the record indicating that ARCO, among others, checked these postings.
 
 
 52
 For reasons comparable to those discussed above, we conclude that the practices of posting and checking this detailed information supports a reasonable and permissible inference of an agreement or understanding concerning prices. The appellees' assertedly independent explanation for such posting was that, as one Standard Oil official put it:
 
 
 53
 It was our desire to be open and straightforward in the matter of our product pricing and to make available for any customer the ability to look and see what our posted price was.... I guess one might say that it was for the logic of being open and above board on what our prices were to our customers. We had nothing to conceal and it was just a mechanism to accomodate that openness.
 
 
 54
 Another Standard official testified that the posting was done "[f]or the customer's benefit, to inform the customer what the applicable prices were." A Mobil official testified that the purpose of the posting was to allow any individual dealer to come in and check "that he wasn't being discriminated against." It is uncontested, however, that any changes in tankwagon prices or dealer discounts were directly reported to the dealers.
 
 
 55
 Other testimony indicates that the purpose and effect of the posting was to allow competitors to learn quickly of any withdrawal of dealer support. The following testimony from a Standard Oil official is illustrative:
 
 
 56
 Q. ... Was there any business reason why the temporary dealer assistance that was being granted in the trade zone ... should have been published or made available to anybody other than the dealers?
 
 
 57
 A. Yes, I think a practical business reason. If we had raised our prices to our dealers, and our dealers had raised it on the street generally, I think particularly our dealers ... may have been as much as one, two, three, four cents--they were all over the lot. If a competitor saw this, he might wonder, "Is this a dealer movement, or has Standard Oil Company raised their prices to cause this reaction in the marketplace?" ...
 
 
 58
 Q. ... The reason you are giving, then, is that you wanted the competition to know what the price move was.
 
 
 59
 A. Exactly.
 
 
 60
 Given that the evidence thus indicates that the purpose and effect of the public posting was the same as for the press releases, we similarly conclude that a reasonable inference of agreement may be drawn from this evidence.
 
 
 61
 We also perceive no Matsushita problem in permitting such an inference. To the extent that the appellees assert business motivations comparable to those discussed in Section III-B-1, our analysis is the same. Furthermore, given that the appellees' asserted purpose of assuring dealers that there was no discrimination could easily be achieved through other means, we have little difficulty concluding that permitting such an inference will not deter any significant or valuable independent conduct.
 
 
 62
 Lastly, we perceive an additional reason why the posting of this information may serve as the basis for an inference of conspiracy. The record indicates that the information posted was unusually detailed, listing tankwagons and dealer discounts for each individual price zone. Such detailed information would have the effect of revealing any gradual shading of wholesale prices that might occur in a particular zone. The record indicates that the spread of such shading was one factor that contributed to the gradual collapse of price restorations. By posting and checking such information, several of the appellees created a mechanism whereby shading might be discouraged or detected. In light of the fact that disclosure of this sort of sensitive price information might be considered contrary to a firm's self-interest, a jury may reasonably conclude that it was the intention and common understanding of these companies to discourage such shading, thus facilitating and possibly lengthening restoration periods.
 
 C. Evidence of Competitor Contacts
 
 63
 The third set of evidence which the appellants claim supports an inference of an agreement consists of evidence concerning alleged contacts between the appellees.
 
 1. Pre-Container contacts
 
 64
 The appellants assert that, prior to the Supreme Court's decision in Container, the appellees all regularly provided one another with information concerning dealer tankwagons and discounts. The record contains evidence indicating that the appellees did in fact engage in direct communication concerning price levels and dealer support. For example, Agnar Nerheim, a marketing official with Standard Oil, testified that between 1956 and 1958 he telephoned competitors to determine what retail price level they were supporting in the market, and that he sometimes asked what was the specific amount of dealer assistance being given. He also testified that he received similar calls from competitors. When asked about which specific companies were involved, Nerheim testified that he had such conversations with individuals from Union, Richfield (now ARCO), Texaco, General (now Mobil) and Shell.
 
 
 65
 Nerheim testified that such price verifications continued after he was transfered to Standard's Los Angeles office. Nerheim stated that he was transfered to Los Angeles because most of the major oil companies were headquartered there, and it would therefore be easier for him to contact competitors. In addition to verifying prices, Nerheim stated that he also spoke with competitors in order to obtain "market intelligence," including information concerning wholesale and retail matters. Among the subjects discussed were the price wars that were taking place in Los Angeles. Nerheim testified that, during this time period, he had discussions concerning such market intelligence with officers from ARCO, Humble (now Exxon), Texaco, Mobil, and Gulf. Most of these contacts were face-to-face visits rather than phone calls. Nerheim stated that he kept no records of these competitor contacts, and that he had been specifically instructed by his superior not to put down on his expense reports the names of any competitors whom he took to lunch. Nerheim stated that such contacts continued until 1967.
 
 
 66
 Moreover, Robert Erhard, an official with the Carter Oil Company (later acquired by Humble, now Exxon) testified that, sometime between 1959 and 1961, Agnar Nerheim came to his office in Seattle and explained to him how they could converse about pricing without there being any telephone record. According to Erhard, Nerheim explained that the local Standard office in Seattle could reach him on a company WATS line, and that calls could therefore be made through the local office without appearing on company long-distance records. In light of Erhard's and Nerheim's testimony, it seems clear that the record supports an inference that Nerheim engaged in secret conversations with competitors concerning price levels during the 1960s. Other testimony indicates that other Standard employees engaged in similar conversations with competitors during this time period.
 
 
 67
 The appellees do not appear to contest the appellants' suggestion that such contacts took place prior to the decision in Container. Instead, they raise two arguments as to why the evidence should not be considered as supporting an inference of conspiracy. The appellees first argue that the testimony is "ancient" and is too "stale" to have any probative value. For several reasons, we must reject this contention. First, although all of this pre-Container evidence falls outside the limitations period applicable in this case, the district court dismissed this action without ruling on the plaintiffs' claim that the statute of limitations had been equitably tolled by the defendants' alleged fraudulent concealment of their activities. If the statute was tolled, then we would have little difficulty concluding that the appellants' evidence of secret direct price exchanges among the appellees supports an inference of an agreement to fix or stabilize prices. Accordingly, on remand the district court should consider whether the statute of limitations has been tolled; if it has, then the plaintiffs may use this evidence of competitor contacts in order to establish the existence of a conspiracy during the pre-Container period.
 
 
 68
 Second, we think that the pre-Container evidence is relevant to establishing the appellees' intent and motive in publicizing, through press releases and posting, their dealer tankwagons, dealer discounts, and supported retail prices. The appellants have produced evidence indicating that these methods of publication were generally meant to serve the same purposes as the direct competitor contacts that had preceded Container, and, indeed, that they were used as a substitute for such contacts in the post-Container period. Thus, for example, Nerheim testified that, by 1967 (two years before Container ) Standard had largely abandoned the practice of verifying its prices directly to its competitors, relying instead on its system of posting such information publicly, a practice which it had begun earlier in the decade. Nerheim stated that, before he left Los Angeles in 1967, such information was publicly posted, and competitors therefore no longer needed to verify prices with him verbally; they would just check the listings and then drop by his office to say hello. Occasionally during this period, however, Nerheim still responded to phone calls requesting information on specific wholesale dealer allowances.
 
 
 69
 Similarly, C.R. Jones, an official with Mobil, testified that Mobil used several different methods to obtain information from competitors concerning dealer aid, but that the use of direct horizontal communications was dropped after the decision in Container was announced. Thereafter, Mobil relied largely on trade publications, contacts with competitive service station dealers, and checking postings in order to obtain information concerning competitors' levels of dealer aid. Although various Mobil bulk plants had been posting in various degrees for some time, after Container Mobil instituted a uniform practice of posting at all of its plants across the United States. As noted earlier, this uniform system of posting included publicizing Mobil's tankwagons and dealer discounts for specific trade zones. Mr. Jones specifically testified that this shift in methods did not represent a change in overall business practices:
 
 
 70
 ... The decisions in the Container case changed our communications. But we did not intend that it change any business procedures or practices that we had historically been operating under, that we felt were not necessary to change. We were attempting to maintain our conduct on a--in a legal manner, and certainly not attempting to say we have to change our way of life because of a decision in a court case.
 
 
 71
 We think that this evidence concerning the shift to indirect methods of informing competitors of wholesale price levels provides some support for the appellants' claim that the post-Container price publications were made pursuant to a common understanding or agreement. The pre-Container activities, which involved verifications of dealer support levels upon personal request, fit squarely within the scope of Container. The appellants' evidence suggesting that the appellees shifted methods of communication, without abandoning the goal of giving and receiving such information, supports an inference that the public dissemination of dealer support information was undertaken pursuant to a mutual understanding.[16]
 
 
 72
 The appellees also claim that the legality of their pre-Container conduct was upheld in Hanson v. Shell Oil Co., 541 F.2d 1352, 1359-60 (9th Cir.1976), cert. denied, 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977), and Gray v. Shell Oil Co., 469 F.2d 742, 746-47 (9th Cir.1972), cert. denied, 412 U.S. 943, 93 S.Ct. 2773, 37 L.Ed.2d 403 (1973). We disagree. First, we note that both of those cases arose under different procedural postures than the present case, and they involved different standards of review. Hanson was an appeal from a jury verdict for the defendants after a second trial. The plaintiffs contended that the granting of a new trial after the first jury had ruled in their favor was an abuse of discretion. Hanson, 541 F.2d at 1359. After reviewing the record, we held that the trial court did not abuse its discretion in concluding that the first jury's verdict was against the weight of the evidence. Id. at 1359-60. In Gray, the jury had rendered a verdict for the defendant, Shell Oil Co.; we therefore noted that, on appeal, we were required to view the evidence in the light most favorable to Shell. Gray, 469 F.2d at 746. Our standard of review in the present case is, of course, very different from that applied in Hanson or Gray. Here, the appellants contest the entry of summary judgment against them. We review the district court's decision de novo, and, within the limits established by Matsushita, we view the evidence in the light most favorable to the appellants. See Matsushita, 475 U.S. at 587-88, 106 S.Ct. at 1356 (noting that, within the limits imposed by antitrust law, "[o]n summary judgment the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion") (quoting United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)).
 
 
 73
 Furthermore, as the appellants correctly note, the claims in Hanson and Gray were quite the opposite of those alleged in this case. As required by Container, in both Hanson and Gray we undertook a highly fact-specific inquiry. In neither case did we broadly endorse competitor contacts for the purpose of price verification. The plaintiffs in Hanson and Gray sought to establish that the defendants had conspired to create price wars in order to drive independent marketers out of business. Hanson, 541 F.2d at 1355; Gray, 469 F.2d at 746. We noted that the exchange of wholesale price information was initiated by dealers in Gray and by the companies in Hanson in order to benefit dealers facing severe competition, and we concluded that on the specific facts of those two cases "[s]uch exchange of information does not rise to the level of an illegal conspiracy." Hanson, 541 F.2d at 1360; Gray, 469 F.2d at 747.
 
 
 74
 By contrast, the evidence in the present case amply supports an inference that the exchange of price information by the appellees was done with the purpose and effect of allowing greater coordination and stabilization of prices. Thus, while in Hanson we distinguished Container, noting that "[t]he goal of either company was not shown to be price stabilization...." 541 F.2d at 1360; see also Gray, 469 F.2d at 746-47 ("Here, as distinguished from Container, the price inquiries were initiated [by the dealers] and the information was sought, not for the direct benefit of Shell, but for the benefit of the dealers.... This is a far cry from Container, where the price information was sought solely for the benefit of the manufacturers...."), exactly the opposite is true in this case.
 
 
 75
 In sum, we conclude that the evidence concerning the appellees' pre-Container activities is sufficient, when considered together with the evidence concerning pricing patterns, to support an inference of an agreement to stabilize prices. If anything, the pre-Container contacts are stronger evidence of conspiracy than the price dissemination practices discussed above in Section III-B. Accordingly, on remand the district court must consider whether the statute of limitations has been equitably tolled. Furthermore, even if the statute has not been tolled, we think that the pre-Container evidence is nonetheless relevant in helping to establish the appellees' intent and purpose in disseminating, during the post-Container period, information concerning dealer tankwagons and levels of dealer support and assistance.
 
 
 76
 Finally, as with the price dissemination practices, permitting an inference of conspiracy from direct competitor contacts will not have significant anticompetitive effects. Appellees have alleged no pro-competitive rationale for their behavior that easily could not be achieved through other means. See discussion in III-B-1 and III-B-2 supra. Moreover, given that appellees have largely abandoned the practice already there is no reason to believe that allowing the inference now will have any significant economic impact. Thus, we find that the inference of a conspiracy to stabilize prices is permissible under Matsushita.
 
 2. Post-Container contacts
 
 77
 The appellants point to a number of items of evidence which they claim indicate that direct verbal contacts concerning pricing continued to occur after the decision in Container. In their intitial pretrial brief below, the appellants asserted that although such contacts were reduced after Container, they were not eliminated, and they remained an important supplement to the alternative methods of data dissemination that were "tried and perfected" in the post-Container period.
 
 
 78
 The appellants refer to several instances of direct evidence of competitors contacts after Container, some of which concededly involved discussion of price information, and others of which the appellants claim support an inference that prices were discussed. For example, the appellants point out that J.F. Rogers testified that, while he was a pricing manager with ARCO in 1971, he spoke with E.H. McGee of Mobil on a few occasions in order to confirm Mobil's dealer allowances. Rogers also stated that he called McGee on "a couple of occasions" in 1971 in order to confirm preliminary field reports he had received from ARCO employees to the effect that Mobil had withdrawn dealer support and restored its prices. The appellees attempt to belittle this evidence by suggesting that Rogers was a "low-level" employee and by pointing out that he did not report his contacts with McGee to his superior at ARCO, Mr. Douglas.
 
 
 79
 With regard to the appellees' contention that Rogers was too low-level an employee to be of significance, we see no reason for concluding that such information gathering cannot be delegated to subordinates. Accordingly, the fact that Rogers did not himself have authority to make ARCO pricing decisions is not dispositive. At any rate, an argument concerning the relative significance of Rogers' testimony in light of his position in ARCO's overall chain of command seems more appropriately addressed to a jury than to a summary judgment court. Furthermore, examination of Rogers' testimony indicates that although he claimed that he did not tell Douglas the source of his information concerning restorations, Rogers testified that he did convey to Douglas the substance of the information obtained:
 
 
 80
 Q. Did you report to Mr. Douglas in these instances that you had received confirmation from McGee that Mobil had restored?
 
 
 81
 A. No, sir.
 
 
 82
 Q. Why not?
 
 
 83
 A. Well, I--I didn't think it was necessary for one thing. I--I could--I could report that Mobil had--had restored and I--and I'd already had a preliminary field report, so I was comfortable in reporting it to him a few hours earlier than I would have otherwise.
 
 
 84
 Rogers claimed that these contacts only shortened by "a few hours" the time in which he could report a Mobil restoration, suggesting that the significance of such contacts was of negligible importance. However, a memorandum written by Rogers to Douglas in late 1971 suggests that such contacts were an important means of verifying or ascertaining whether Mobil was restoring its prices. In the memorandum, Rogers noted that "[e]ven though Mobil announces a restoration, it is often times hard to detect because of rent considerations which are reflected in lower street prices."
 
 
 85
 The appellants also noted in their pretrial brief that McGee testified that he discussed Mobil's distributor discounts with Herbert Wetzler at some point after the early 1970s. McGee stated that he knew that Wetzler wanted such information as a pricing consultant, although he also stated that he did not know for whom Wetzler was consulting. The record indicates that Wetzler was a consultant for Union beginning in late 1971 and lasting throughout the 1970s, and that he also did some consulting work for Lerner Oil Co., Powerine Oil Co., and the Lundberg Surveys. In addition to the conversations with McGee, Wetzler testified that he spoke with Frank White of Mobil concerning general "market intelligence." Wetzler also testified that, although he did not have a specific recollection, he may have discussed some retail prices with Nerheim after Container. Wetzler stated that his understanding of Container was that, although he and Nerheim could not discuss their own companies' prices or future prices of any sort, they could discuss past or present prices of other competitors. Although, as the appellees note, Nerheim denied having such conversations, we are required to view the evidence in the light most favorable to the appellants.
 
 
 86
 The appellants also point to a memorandum from V.T. Chamberlain to Mr. McGee, which described the results of a Mobil survey of competitor publication practices in the Phoenix area. The memorandum states that pricing information "is available at the Texaco plant here in Phoenix." An asterisk is penciled in after the word "the" in this sentence, and the following handwritten comment appears in the margin under a corresponding asterisk: "Not Posted but available on pers. req." One could reasonably infer from this statement that Texaco continued to respond to direct personal requests for dealer price information. Indeed, the appellees' only response to this contention is to argue that any such provision of information by Texaco was innocent because the information provided was "public." For the reasons outlined in Section III-B-1, supra, this argument is unavailing.
 
 
 87
 Lastly, the appellees claim that these items of evidence are too "anecdotal" and fragmentary to support a broad inference of conspiracy of the sort alleged here. Were these items of evidence standing alone, we might be inclined to agree. At the very least, we note that the appellants' evidence of direct competitor contacts is substantially less impressive for the post-Container period than for the pre-Container period. Nonetheless, we conclude that, in light of the evidence concerning the appellees' shift to different methods of price data dissemination and the evidence indicating similar patterns of price restorations during the pre- and post-Container periods, this evidence supports the appellants' limited claim that direct competitor contacts remained an occasional, although less frequently employed, method of circulating information concerning dealer discounts and supported price levels.[17] Indeed, some of the items discussed above are examples of direct evidence of such contacts. As such, we are not free to discredit them on summary judgment. McLaughlin, 849 F.2d at 1207-08.[18]
 
 
 88
 The appellants also claim that the existence of direct verbal contacts after Container may be inferred from various items of evidence which they claim indicate that the appellees had advance notice of price changes. In particular, the appellants point to a log kept by W.B. Lovell, a pricing clerk for Standard. The log contains several entries indicating that on a number of occasions Lovell was aware of restoration moves in advance of their effective date. In addition, an ARCO memorandum from Rogers to Douglas indicates that ARCO had obtained advance information concerning Shell's dealer aid levels from "always reliable sources."
 
 
 89
 The district court considered this evidence to be of little value because it did not disclose the manner in which Standard had obtained such information. Petroleum Prods., 656 F.Supp. at 1301. For example, the July 26, 1971 Lovell log entry stated that "Ag Nerheim called to inform us of the possibility of Shell returning to normal effective opening of business 7-27-71. Have field watch closely and report any movement to him." The district court noted that "[w]e do not know where Mr. Nerheim got his information concerning Shell's impending move," but, in light of the fact that Shell dealers would have been notified of the move in advance, the district court speculated that "[i]t may be that Mr. Nerheim saw a Shell dealer changing his price posting sign." Id. The appellants argue that this sort of speculation defies summary judgment law by failing to view the evidence in the light most favorable to the nonmovant. The appellees contend that the district court merely recognized that, under Matsushita, such evidence was insufficient to support an inference of conspiracy.
 
 
 90
 We appreciate the district court's concern over the absence of any evidence indicating the source of this sort of advance information. As the court correctly noted, it is possible that such information might have been obtained through innocent means, such as the direct observation of retail price changes at individual competitive stations. This concern is especially appropriate where, as here, the record indicates that the appellees regularly conducted surveys of the pump prices at competitive stations. Accordingly, were such evidence standing alone, we would be inclined to agree with the district court that, under Matsushita, this evidence does not support an inference of conspiracy. To allow an inference of agreement from such evidence, standing alone, would have the effect of deterring competitors from obtaining information about other companies' actual retail prices, even through legitimate means. We can think of few inferences that would have a more undesirable distorting effect on market conduct. For this reason, as we found with the pricing pattern evidence, this advance notice information may not serve as proof of an antitrust violation without further evidence that is sufficiently unambiguous and tends to exclude the possibility that the appellees acted lawfully. In the present case appellants have proffered such evidence. Given the other items of evidence that we have already described, we perceive no Matsushita problem in permitting the jury to draw a reasonable inference that this advance knowledge was acquired through what are in this case less innocent data dissemination techniques, namely direct competitor contacts or public posting or advance public announcement.
 
 3. Contacts with independent marketers
 
 91
 Finally, the appellants rely upon a number of items of evidence which they contend indicate that the appellees used direct contacts in order to coordinate their activities with the independent segment of the market.[19] For example, the appellants presented testimony indicating that Paul Erdos, an officer of the Serve Yourself & Multiple Pump Association ("SYMPA"), an organization of independent gasoline dealers, had conversations with officials of a number of the appellees concerning various pricing matters. Erdos testified that, during the pre-Container period, he had conversations concerning dealer tankwagons and wholesale prices with employees of several of the appellees. Charles Temme of ARCO also testified that during the 1960s Erdos provided information concerning upcoming restoration attempts and that Erdos urged ARCO's support. The evidence also indicates that during the post-Container period Erdos continued to obtain information concerning dealer tankwagons, either from direct personal contacts, postings, or the trade press. Thus, James Carbonetti of Mobil stated that, during the second half of the 1970s, he provided Erdos with information concerning Mobil's posted tankwagon prices.[20] Erdos also contacted members of the trade press in order to confirm changes in dealer tankwagon levels. Finally, the appellants have produced evidence indicating that Erdos sometimes complained directly to oil companies concerning their dealers' pricing practices.
 
 
 92
 The most significant evidence of a connection between the major oil companies and the independents comes from the testimony of Kenneth Galligan, an official with Powerine Oil Company. Galligan testified that he and other Powerine officials had a number of conversations with Herb Wetzler of Gulf concerning the independents' pricing. For example, Galligan stated that, shortly after he joined Powerine in 1969, he and several other Powerine officials spoke with Wetzler, who told them that it would benefit everyone if the independents could be "priced and moved as a group," much as the majors had been able to coordinate their pricing.
 
 
 93
 Galligan also testified that he had other meetings with Wetzler during the period from July 1970 to September 1971. Galligan stated that the purpose of those meetings was to "gain [Wetzler's] cooperation in getting commitments from major oil companies who retailed gasoline in the markets [in which Galligan operated]," and "to arrange with [Wetzler] and establish with him the prices to which those companies would move to on specific dates prior to the time the restoration was made at service station level." Galligan testified that Wetzler told him that "a specific oil company would move its tankwagon price to support a retail price ... in certain areas on certain dates." It should be noted, however, that Galligan testified on cross-examination that he had no personal knowledge concerning whom Wetzler contacted or which majors he contacted. He testified to the same effect on direct examination, stating that Wetzler refused to tell him.
 
 
 94
 Galligan also testified that he contacted Herb Wetzler, Paul Erdos, and several non-major oil company executives concerning a proposed schedule for a retail price increase in October 1970. In particular, Galligan spoke to Wetzler, who told Galligan that the majors had told Wetzler that if there were any difficulties with the price move, Galligan should wait until Wetzler had had a chance to straighten it out. The following week, Wetzler and Erdos spoke to Galligan and confirmed that the price move had been successful.
 
 
 95
 Galligan also testified concerning conversations with majors other than Gulf. For example, Galligan testified that, sometime between 1969 and July 1970, he overheard several conversations between Jack Keane of Powerine and Nerheim of Standard. Galligan testified that Keane and Nerheim discussed retail price hikes among independents, and Keane would ask Nerheim what he thought of a particular proposal. Nerheim would usually respond by first saying something like "As you know, Jack, we don't get into that," and then saying something that would indirectly indicate approval such as "That might be a good idea" or "The weather looks good." Galligan also stated that he overheard Keane and Nerheim discussing the schedule whereby the oil companies would restore retail prices. In one case, Standard would go first and Shell second, while in another Standard went first and Mobil second. Galligan testified that he instructed Keane to make these calls in order to confirm information he had received from Wetzler and Erdos concerning when Standard stations would restore their retail prices. After Keane had made one such call, Galligan and Keane discussed what had taken place during the call. Galligan stated that he and Keane concluded that "Wetzler's information that Standard was committed was true."
 
 
 96
 In addition, Galligan testified that Keane had received confirmation of Mobil's participation in a restoration directly from a Mobil marketing manager. Furthermore, Galligan testified that the person in charge of retail pricing in Los Angeles for Shell Oil Company committed in advance to retail price restorations. Galligan's information on this score was based on what he was told by Erdos and Wetzler.
 
 
 97
 In addition to this testimony concerning contacts between the independents and the major oil companies, the appellants presented other evidence concerning contacts among the independents themselves. This evidence indicates that Erdos was involved in coordinating the responses of independent dealers to restoration attempts by the appellees. For example, several memoranda prepared by Newton Carey, a general manager for the independent oil company Simas Brothers, summarized a number of phone calls that Carey received and made to other independents. Several of these calls, including a number involving Erdos, concerned price changes among the independents after major oil company restorations. Many of the calls appear to have involved quite blatant price-fixing activity. Thus, Carey's October 12, 1970 memorandum to Mr. Simas states that "I phoned Mr. Erdos and asked him about getting those Douglas stations up in the El Cerrito area. He said that he would phone."
 
 
 98
 Furthermore, Galligan testified that, while at Powerine, he asked Erdos on numerous occasions to contact competitors, both major and independent, to see what their reaction would be to a proposed retail price restoration. Erdos would get a commitment from these competitors before the restoration took place. Galligan also stated that Powerine would never restore its prices unless it had a prior commitment from the "vast majority of major oil companies."
 
 
 99
 Other portions of Galligan's testimony are to the same effect. Galligan stated that Erdos was frequently a source of advance information concerning various companies' participation in price increases, although most of the time Galligan got this information indirectly through Keane or Wetzler. Galligan stated that Erdos' job was to "get people in line for future pricing," and after the price increase had taken effect, to threaten noncomplying dealers that they had better participate or they would face retaliation from their suppliers.
 
 
 100
 We have little difficulty concluding that, if admissible, this testimony is sufficient to permit a jury to conclude that representatives of several of the appellees were involved in activities designed to assure that the independent sector of the market would follow restoration attempts, and that several officials of independent companies engaged in direct price-fixing with one another in order to produce such coordination. The appellees, however, argue that there are a number of evidentiary problems in Galligan's testimony and that, without this testimony, the appellants do not have sufficient evidence to establish a link between the independent market and the appellees. For several reasons, the district court agreed with the appellees. First, the court concluded that most of Galligan's testimony was irrelevant or immaterial. Second, the court also concluded that most of the testimony was hearsay. Third, the court noted that Galligan's testimony had been challenged "by every other relevant witness" and that Galligan had been "substantially discredited." Petroleum Prods., 656 F.Supp. 1302-03. In reaching these conclusions, however, the district court did not focus upon any specific portions of Galligan's testimony; the court simply rejected it in a wholesale fashion.
 
 
 101
 In light of our above discussion of certain specific portions of Galligan's deposition, we have little doubt that such testimony is relevant and material to the issues in this case. The hearsay issue, however, is somewhat more difficult. We note that much of the information provided by Galligan consists of out-of-court statements of third parties. As such, the statements initially appear to fit within the definition of hearsay specified in Fed.R.Evid. 801(c). Upon closer analysis, however, we conclude that each of the statements qualifies as nonhearsay under either Rule 801(d)(2)(D) or Rule 801(d)(2)(E).
 
 
 102
 Rule 801(d)(2)(D) provides that a statement made by a party's agent or servant may be introduced against that party if it concerns a matter within the scope of the agency or employment and was made during the existence of the relationship. We conclude that this exception applies to Wetzler's various statements that Gulf would support retail price restorations. Wetzler was Gulf's marketing director, and the statements are therefore related to a matter within Wetzler's scope of employment. We reach this conclusion despite the fact that the appellees point out that Wetzler testified that he did not have authority, on his own, to raise Gulf's prices whenever he wanted to do so. First, we note that Wetzler testified that he was responsible for gathering "market intelligence" for his superiors and that he acted as a liaison between top Gulf management and the field with respect to "price changes approved by top management [or] initiated in the field." In light of these duties of Wetzler, it seems clear that the statements that Galligan claims Wetzler made are related to a matter within his scope of employment. Second, in light of the fact that the Supreme Court has held that under Fed.R.Evid. 104(a) an out-of-court statement may be considered by the court in making the preliminary factual determinations concerning admissibility of statements under Rule 801(d)(2)(E), see Bourjaily v. United States, 483 U.S. 171, 177-81, 107 S.Ct. 2775, 2779-82, 97 L.Ed.2d 144 (1987), we conclude that Wetzler's out-of-court statements may themselves be considered in determining the preliminary question, under Rule 801(d)(2)(D), of the scope of Wetzler's employment duties. Since the statements clearly indicate an ability to communicate information on behalf of Gulf, we conclude that, considering all of the evidence, Wetzler's statements concerned a matter within the scope of his employment.
 
 
 103
 In light of this conclusion, no further showing is required to admit these statements against Gulf. See United States v. Ramsey, 785 F.2d 184, 191 (7th Cir.) (statements admitted under Rule 801(d)(2)(D) may be used to prove conspiracy without any showing that the existence of the conspiracy is corroborated by independent, nonhearsay evidence), cert. denied, 476 U.S. 1186, 106 S.Ct. 2924, 91 L.Ed.2d 552 (1986); see also United States v. Cross, 816 F.2d 297, 302 (7th Cir.1987) (same). Similarly, Nerheim's statement that Standard was committed to a retail restoration is admissible against Standard. None of these statements is admissible against the other defendants, however, unless they meet the requirements of Rule 801(d)(2)(E), which relates to statements of a coconspirator.
 
 
 104
 Rule 801(d)(2)(E) provides that a statement made by a co-conspirator of a party may be introduced against that party if the statement was made during the course, and in furtherance, of the conspiracy. The numerous instances wherein various third parties assertedly told Galligan that certain defendants had agreed to price restorations would appear to be prime candidates for this exception from the definition of hearsay. As noted above, Galligan's testimony included evidence of the following statements: Wetzler said Standard was committed to a particular restoration; Nerheim said that on particular occasions Shell and Mobil were committed; Erdos and Wetzler said Shell was committed to a particular increase.
 
 
 105
 Before these statements can be admitted, however, they must meet all of the prerequisites of Rule 801(d)(2)(E). Specifically, the party seeking to introduce the statement must show, by a preponderance of the evidence, that "there was a conspiracy involving the declarant and the nonoffering party, and that the statement was made 'in the course and in furtherance of the conspiracy.' " Bourjaily, 483 U.S. at 175, 107 S.Ct. at 2778. Although a judge may consider the statements themselves in deciding whether these prerequisites have been met, see id. at 177-81, 107 S.Ct. at 2779-82, the offering party must present "some evidence aside from the proferred co-conspirator's statements [to] show that the [nonoffering party] knowingly participated in the alleged conspiracy." United States v. Silverman, 861 F.2d 571, 577 (9th Cir.1988); see also United States v. Gordon, 844 F.2d 1397, 1402 & n. 2 (9th Cir.1988). Moreover, in Silverman we defined the character of the additional evidence: "[E]vidence of conduct that is completely consistent with defendant's unawareness of the conspiracy" cannot serve as corroborating evidence under Rule 801(d)(2)(E). Silverman, 861 F.2d at 578.
 
 
 106
 In the antitrust context the Silverman requirement can be met if the circumstantial evidence offered in addition to the co-conspirator's statements is adequate to defend against summary judgment under Matsushita. Under Matsushita in order to survive summary judgment on the basis of circumstantial evidence alone, a plaintiff must offer evidence that is consistent with an inference of illegal conduct and permitting that inference must not be significantly harmful. This requirement comports with the Silverman mandate against allowing "wholly innocuous conduct" alone to serve as proof of conspiracy. Id.
 
 
 107
 In the instant case, the press releases, price postings and evidence of competitor contacts previously discussed provide evidence of a conspiracy aside from Galligan's statements. Since we have concluded earlier that appellant's evidence is sufficient to survive summary judgment under Matsushita, the appellants have met their burden of producing some evidence apart from Galligan's testimony that indicates the existence of conspiracy.
 
 
 108
 The remaining question, then, is whether this evidence along with Galligan's statements are sufficient to show by a preponderance of the evidence that there was a conspiracy. Viewing the evidence in the light most favorable to appellants, we find that there is sufficient evidence to conclude, for purposes of Rule 801(d)(2)(E), that the appellees were co-conspirators.[21] The statements are therefore admissible against all defendants under Rule 801(d)(2)(E).
 
 
 109
 Finally, we reject the district court's suggestion that Galligan's testimony could be disregarded because it had been "substantially discredited." Petroleum Prods., 656 F.Supp. at 1303. It is well-established that "[c]redibility determinations ... are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). The two cases cited by the district court, Mesirow v. Pepperidge Farm, Inc., 703 F.2d 339, 344 (9th Cir.), cert. denied, 464 U.S. 820, 104 S.Ct. 83, 78 L.Ed.2d 93 (1983), and Radobenko v. Automated Equip. Corp., 520 F.2d 540, 543-44 (9th Cir.1975), do not support its conclusion. Mesirow and Radobenko dealt with the narrow situation where the only material issue of fact was created by a party's own directly contradictory affidavits or deposition testimony, given during the course of the same litigation. In Mesirow and Radobenko, we held that, under those narrow circumstances, the party's conflicting statements do not create a genuine issue of material fact. In the present case, by contrast, Galligan is not a party, and he has not given flatly contradictory testimony during the course of this litigation.
 
 
 110
 Since Galligan's testimony is admissible for summary judgment purposes against all of the appellees, we conclude that his testimony, considered along with the other evidence discussed in this subsection, is sufficient to create a jury question as to whether the appellees, as part of their efforts to coordinate their own prices, also sought to assure that the independent oil companies would coordinate their pricing behavior.[22]
 
 
 111
 IV. APPELLANTS' CLAIMS OF A CONSPIRACY TO RESTRICT SUPPLY
 
 
 112
 In the proceedings below, the plaintiffs also alleged that the defendants engaged in a conspiracy to restrict the supply of crude oil and refined petroleum products. The plaintiffs claimed that the defendants' efforts to restrict supply culminated in the August 1972 "restoration to end all restorations." That is, after August 1972, price cycling stopped; from that point forward the pressure created by supply shortages was sufficient to keep prices at their restored "normal" level, and indeed, in 1973 retail prices began a steady climb as supplies continued to prove inadequate to meet growing demand. The district court, however, concluded that the plaintiffs had failed to produce sufficient evidence to support their claims of a conspiracy to restrict supply, and it therefore granted summary judgment to the defendants.
 
 
 113
 On appeal, the appellants assert that they produced sufficient evidence to permit a jury to conclude that the appellees agreed to engage in various activities designed to reduce the domestic supply of petroleum products. They contend that, as part of this conspiracy, the appellees agreed to exchange information concerning actual production levels, expected future demand, and expected supply projections. The appellants also assert that, as part of the same plan, the appellees conspired to reduce the amount of crude oil lifted overseas and shipped into the United States. We will consider each of these contentions in turn.
 
 A. Domestic Activities
 
 114
 The appellants have produced evidence indicating that by the early 1970s several of the appellees had come to the conclusion that excess production was a key factor in creating price wars. As the district court noted, "The files of several of the defendants contained in-house memoranda that expressed dissatisfaction with the practice by their respective employers of producing so much gasoline that they were obliged to sell the surplus to independents, who, in return, competed with the sellers at reduced prices." Petroleum Prods., 656 F.Supp. at 1307. The appellants also produced evidence indicating that several of the appellees had begun thinking that it would be better to eliminate this excess production, but that they also recognized that this could not be accomplished without some sort of joint action. For example, in commenting on the National Oil Jobbers' Council's recommendation that "excess" production be eliminated, a 1971 internal Shell memorandum remarked: "good thought--how accomplish short of collusion." An earlier May 1971 Shell memorandum had reached a similar conclusion:
 
 
 115
 If the wholesale price of gasoline moves up commensurate with the current and anticipated crude price increases and refinery operations are geared to maintaining such increased wholesale prices, then cut-price marketers will have to raise their prices proportionately.... [This alternative] involves one refiner after another acting in statesmanlike fashion.
 
 
 116
 (emphasis added).
 
 
 117
 The appellants contend that the appellees reached an agreement or understanding to restrict supply in this fashion in part by means of an exchange of information concerning projected supply and demand. In this regard, we note that the record indicates that several of the appellees did in fact occasionally obtain information, sometimes through direct personal contacts, concerning supply and demand forecasts and production levels. For example, a May 1972 Mobil memorandum summarized the aggregate crude oil demand forecasts of several competitors, including appellees Mobil, Exxon, Texaco, Gulf, and Shell. The memorandum indicated that the information had been obtained from a variety of sources, including direct competitor contacts. The memorandum noted that "[i]n several cases we were able to get quite specific volume figures by area from direct contacts." In most of the other cases, the information had been obtained from press releases, public statements, or annual reports, and in many of these instances, Mobil was "able to render [the figures] more precise by checking them out with people we know inside the companies." The exchange of supply information among the appellees is further indicated by the fact that ARCO had in its files a copy of a detailed summary of supply and demand forecasts that had been prepared by Union.
 
 
 118
 In addition, the appellants produced a June 1972 Mobil memorandum reporting the results of direct competitor contacts with officials of Texaco, Exxon, and Gulf concerning sour crude production capabilities. The memorandum indicates that the competitors had provided fairly detailed information concerning refinery processing levels. Although, as the appellees note, the memorandum indicates that the information was obtained for the purpose of buying and selling crude oil, one could reasonably conclude that the detail of the information obtained exceeded that which was necessary for this purpose.
 
 
 119
 The appellants also presented evidence indicating that the appellees were able to obtain detailed competitive information concerning supply by participating as observers at meetings of the Independent Petroleum Association of America ("IPAA"). For example, a memorandum in Standard's files contained an IPAA chart listing the supply projections made by several different oil companies. The chart lists, for each quarter of 1970, the supply projections for several different types of petroleum products. Although the chart "anonymously" labels each company by a code letter, the Standard copy has the names of the various companies handwritten along the top of the chart. The companies listed include Union, Getty, and Shell. The record also indicates that Standard itself submitted supply projections for 1970 to the IPAA.
 
 
 120
 The record also reveals that ARCO obtained similar IPAA supply forecasts for the year 1971. ARCO's 1971 chart, like Standard's 1970 chart, contains additional notations indicating which companies made which forecasts. The cover memorandum accompanying the chart states that this information is valuable because "the exact expectations of 8 oil companies and 2 banks are revealed in detail." The memorandum also noted that, although most majors did not formally participate in IPAA activities, "most are present as observers to receive the materials and to contribute to the discussions. This includes even the usually highly reticent Texaco."
 
 
 121
 We also note that the appellants have produced an Exxon memorandum from August 1972 (the month that price cycling ended) indicating that Exxon had contacted a large number of oil companies in order to determine their crude oil supply situation. The memorandum contains a chart summarizing the information obtained as a result of these contacts. Among the companies whose supply information is listed are ARCO, Standard, Getty, Gulf, Mobil, and Shell. The information obtained indicates that most of these companies expected to experience supply shortages during the remainder of 1972.
 
 
 122
 In response to this evidence, the appellees raise two arguments. First, they contend that these exchanges of information were "innocuous" and that no inference of conspiracy can be drawn from them. This argument cannot be squared with the Supreme Court's holding that, under certain circumstances, the exchange of production and supply information may supply "an attractive basis for cooperative, even if unexpressed, 'harmony' with respect to future prices." American Column & Lumber Co. v. United States, 257 U.S. 377, 398, 42 S.Ct. 114, 116, 66 L.Ed. 284 (1921); see also Sullivan, Antitrust Sec. 97 (1977) (Data as to production figures "can be used to police production quotas imposed by a cartel or, in an oligopolistic structure, can facilitate interdependent action in reducing output.") American Column & Lumber teaches that production and supply data dissemination cannot be treated as categorically different from price information exchanges. Accordingly, application of the principles of Container in the supply data context suggest that an agreement to exchange supply and production information may, under appropriate circumstances, serve as circumstantial evidence of an agreement to restrict supply and raise prices. We think that, in light of the evidence concerning the appellees' intent to stabilize the market by reducing excess capacity, see infra, an inference of conspiracy drawn from the appellants' evidence of supply data exchanges is plausible.
 
 
 123
 Second, the appellees argue that the shortages experienced during 1972 and 1973 were real, and that their production facilities operated at "record levels" during this period. In particular, the appellees point out that their refineries were operating at the "maximum sustainable rate." The appellants do not dispute this latter point; instead, they claim that the appellees deliberately chose not to expand refinery capacity and that they did so in order to create a shortage.
 
 
 124
 In support of this claim, the appellants produced evidence indicating, for example, that Standard chose not to expand refinery capacity, despite long-range forecasts of a shortage. Similarly, an Exxon employee based his conclusion that Exxon's refining capacity was sufficient on the assumption that sales of gasoline to the independents would be curtailed. A Shell official reached a similar conclusion that a "conservative" program of refinery expansion would avoid "throwing surplus products into the market place." Furthermore, as the district court noted, see Petroleum Prods., 656 F.Supp. at 1307, an Exxon study committee recommended that refining capacity not be expanded until "forecasts show large and growing shortages for at least two years prior to the onstream time of the expansion." Other items in the record further indicate the appellees' concern with the problem of spare capacity. For example, a 1971 Exxon memorandum noted that Exxon considered the "spare capacity problem to be the single most important problem facing the refining segment of our business over the next several years." Finally, the appellants produced evidence indicating that the resulting "lull in domestic refining capacity construction" contributed to tight supplies and upward pressure on petroleum prices. As one September 1972 Shell memorandum put it, "The current shortage being proclaimed is more apparent than real. Refining capacity has merely moved from a 'long' supply position to what could be characterized as a 'balanced' position.... It just feels 'tight' to some people who have been used to a 'long' situation for a number of years."
 
 
 125
 The district court, in ruling on the motion for summary judgment, simply accepted the defendants' explanations for the shortage and for the lack of refinery expansion. With respect to the failure to expand refinery capacity, the court noted that the cost of constructing refineries had gone up, that environmental litigation was a concern, that it was hard to estimate how much refinery capacity was necessary, and that price controls were a disincentive to further expansion. Petroleum Prods., 656 F.Supp. at 1307-08. With respect to the shortage, the court blamed it mostly on increasing demand. The court asserted that demand had increased due to various factors, such as more people driving and the increasing number of cars with air conditioning and power-operated features. Id. at 1308. The court finally concluded that the evidence showed "quite clearly" that the defendants' actions were the result of independent decisions. Id. at 1309.
 
 
 126
 We think that the district court misconceived the nature of its task under Matsushita. As noted earlier, Matsushita does not authorize the district court to weigh the evidence and decide which inference is the more plausible one; so long as a particular inference is plausible and permissible under Matsushita, it is for the jury to decide whether to draw it. Matsushita, 475 U.S. at 587-88, 106 S.Ct. at 1356-57. The district court in this case appears simply to have adopted one of two competing theories of the evidence. Matsushita does not authorize this sort of resolution, on summary judgment, of disputed issues of fact.
 
 
 127
 Appellants have offered a plausible conspiracy theory. The evidence supports the conclusions that (1) in the early 1970s several of the appellees began taking steps to reduce excess capacity; (2) they did so with the intent and effect of reducing the strength of the independent sector of the market; (3) during this period the appellees exchanged information concerning supply forecasts and production levels, and (4) the shortage of refining capacity, as well as the foreign activities of several of the appellees (discussed below), resulted in supply shortages and upward price pressure. Most significantly, however, it seems clear that these objectives could only be achieved if all others performed similar actions. A single company reducing output would lose market share and sales. Only if all the companies reduced supply would the price rise enough to increase profits. The risk involved in leading a supply reduction suggests that purely interdependent supply decisions are unlikely. Changes in refinery capacity are not readily reversible. Once a company is committed to reducing its capacity it cannot easily recover if the other companies do not follow its lead. Thus, it is unlikely that a firm would undertake a reduction in its refinery capacity without some advance agreement from competitors. It is in this context that the exchange of supply and demand forecasts must be considered. We think that, viewing all of this evidence, a rational jury could conclude that the appellees had agreed to exchange supply and demand forecasts in order to facilitate mutual decelerations of increases in production capacity.
 
 
 128
 This does not settle the matter, however. The question remains whether permitting an inference of conspiracy from the evidence that the appellants have produced would have the effect of deterring important independent conduct. We conclude that it would not. As we stated previously, appellants have offered evidence that the exchange of information followed by shortage was accompanied by appellees' actions to reduce excess capacity, appellees' anticompetitive intent, the actual reduction in the independent sector, and appellees' recognition of the need for parallel action. Appellants have also offered evidence of market conditions in which interdependent supply decisions are unlikely. Although an inference of conspiracy could not permissibly be drawn solely from the exchange of supply forecasts followed by a shortage, we can conceive of no significant procompetitive behavior that will be deterred by permitting an inference of conspiracy when the combination of actions and intent described above occurs.[23]
 
 B. Foreign Activities
 
 129
 The appellants also contend that, as part of the alleged conspiracy to restrict supply, the appellees agreed to restrain Middle East production of petroleum products. In support of this contention, the appellants point to a number of items of evidence indicating that the appellees engaged in discussions about how to keep supply pressures under control. For example, in response to the problem of spare capacity in Iran, the five American majors (Exxon, Gulf, Texaco, Mobil, and Standard) who owned shares of the Iranian Consortium ("IOP") agreed in 1968 that in deciding upon planned capacity targets, the group should be careful not to rely simply on their own estimated needs inasmuch as this procedure might result in capacity figures being set too high. As a memorandum distributed among the five companies indicated:
 
 
 130
 Members should [review] the IOP weighted figures to be sure that growth rates in planned capacity are consistent with annual growth rates generally expected for demand, rather than relying solely on the composite of individual Member estimates for each forward year. In this regard it should be appreciated that small changes in growth percentages lead to plans for rather large capacity additions several years forward.
 
 
 131
 The record also indicates that the IOP members jointly agreed to resist the Shah of Iran's efforts to get IOP to increase available capacity.
 
 
 132
 The record also contains evidence indicating that the owners of Aramco (Exxon, Standard, Mobil, and Texaco) held a two-day meeting aimed at arriving at a response to Saudi Arabian complaints that their oil liftings were not keeping pace with those of other countries such as Iran. During the course of these discussions, Texaco proposed that, if the other IOP owners who were also owners of Aramco would do likewise, it was willing to reduce its liftings in Iran in order to improve Aramco's relative position. Although, as the appellees note, Mobil labeled this blatant cartel allocation proposal "ridiculous," "Mobil did state, however, that if [they] had a competitive price in Aramco, they felt it would definitely hold down the growth rate in Iran." Similarly, although Exxon also rejected Texaco's proposal "legally and for other reasons," it also stated that "it would be our policy to have our Iranian liftings so that they could be defensible with our Aramco performance." Other evidence further indicates that the Aramco owners recognized the need to coordinate production levels among Iran and Saudi Arabia in order to alleviate Saudi pressure for increased production.
 
 
 133
 Finally, we note that the appellants produced evidence indicating that, in connection with these various activities, several of the appellees circulated amongst themselves memoranda containing specific information regarding supply and demand projections for various regions of the world.
 
 
 134
 The appellees raise a number of arguments in response to this evidence. First, they contend that, because IOP and Aramco "were created or operated with the knowledge and acquiescence of the United States Government," the actions taken by the two consortiums cannot serve as a basis of antitrust liability in this case. This argument is without merit. Even if the President had approved the cartel there is no evidence indicating that he authorized any of the appellees' alleged concerted efforts to hold down the growth of foreign production.[24]
 
 
 135
 Second, the appellees argue that each item of evidence upon which the appellants rely does not in fact support an inference of conspiracy. Indeed, they assert that the evidence indicates normal business behavior. Once again, however, we emphasize that it is not our task to decide whether we think that an inference of innocent conduct is more plausible than an inference of conspiracy. Rather, our task is to consider whether an inference of conspiracy is plausible and whether permitting such an inference would have the effect of deterring significant procompetitive conduct. We recognize that it is possible that each IOP owner company independently resisted the increases in production requested by the Shah. However, when considered in the context of their domestic activities with regard to prices and supply, the various actions that the consortium members took in order to control the level of growth in Middle East production plausibly could be construed as part of a conspiracy to restrict supply. In addition, appellees have suggested no procompetitive behavior that would be deterred if plaintiffs were allowed to bring antitrust actions against defendants who undertook the domestic and foreign supply actions alleged in this case.
 
 
 136
 We conclude that the appellants have presented sufficient evidence concerning their allegations of a conspiracy to create a shortage to warrant submission of the issue to a jury. Accordingly, the district court erred in granting summary judgment on these claims. Furthermore, we note that since the parties agree that the shortage, however caused, led to the elimination of the competitive bidding market in bulk sales to government entities, the appellees may be held liable for this consequence if the jury concludes that they did in fact jointly act to restrict supply.
 
 V. CALIFORNIA'S CLAIM FOR CIVIL PENALTIES
 
 137
 The State of California also appeals the district court's January 12, 1978 order dismissing California's claim for civil penalties under Cal.Civ.Code Sec. 3370.1.[25] The district court concluded that it had no jurisdiction to entertain the claim because to do so would, in its view, have violated the principle that federal courts generally do not enforce the penal laws of the states. See Wisconsin v. Pelican Ins. Co., 127 U.S. 265, 8 S.Ct. 1370, 32 L.Ed. 239 (1888); The Antelope, 23 U.S. (10 Wheat.) 66, 123, 6 L.Ed. 268 (1825).
 
 
 138
 We disagree with the district court's conclusion. The Second Circuit recently rejected a similar challenge to enforcement, in federal court, of pendent state antitrust law claims for civil penalties. New York v. Hendrickson Bros., Inc., 840 F.2d 1065, 1086 (2d Cir.), cert. denied, 488 U.S. 848, 109 S.Ct. 128, 102 L.Ed.2d 101 (1988). The court noted that, although the "federal courts have no jurisdiction to enforce the criminal laws of the states, they do have jurisdiction to enforce state penalties that are civil in nature." Id. Since California treats the penalties under Sec. 3370.1 as civil in nature, see People v. Superior Court (Kaufman), 12 Cal.3d 421, 431, 525 P.2d 716, 722-23, 115 Cal.Rptr. 812, 818-19 (1974); People v. E.W.A.P., Inc., 106 Cal.App.3d 315, 321, 165 Cal.Rptr. 73, 76-77 (1980), the district court was not barred from entertaining the claim. Hendrickson Bros., 840 F.2d at 1086. Because the district court found this case to be otherwise "ideal" for the exercise of pendent jurisdiction, we reverse its order dismissing California's claim for civil penalties.
 
 VI. CONCLUSION
 
 139
 The judgment of the district court is REVERSED and the case is REMANDED.
 
 
 
 [1]
 We should note that the holding of Monsanto primarily applies to discussions between the manufacturer and its distributors. Under United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919), it is clear that a manufacturer can have discretion over whom it wishes to deal with so that it can maintain order in its distribution ranks. As this court stated in T.W. Electrical Services, Inc. v. Pacific Electrical Contractors Assoc., 809 F.2d 626, 632 n. 4 (9th Cir.1987), "a manufacturer's independent refusal to deal with distributors did not violate antitrust laws." But the same rationale does not necessarily apply to relationships among competitor companies, and we note that horizontal relationships among co-competitors, such as those which exist in this case, are distinguishable from vertical relationships between a manufacturer and its distributors
 
 
 [2]
 In first considering the parallel pricing evidence alone we do not ignore our mandate to "take special caution to give the [plaintiffs] 'the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each.' " Wilcox v. First Interstate Bank of Oregon, N.A., 815 F.2d 522, 526 (9th Cir.1977) (quoting Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699, 82 S.Ct. 1404, 1410, 8 L.Ed.2d 777 (1962)); see also City of Long Beach v. Standard Oil Co., 872 F.2d 1401, 1404-05 (9th Cir.), amended, 886 F.2d 246 (1989), cert. denied, --- U.S. ----, 110 S.Ct. 1126, 107 L.Ed.2d 1032 (1990). Thus, later in sections III-B and III-C we will consider appellants' claim that appellees exchanged various information to facilitate price coordination in the context of the parallel pricing evidence
 
 
 [3]
 We note, however, that the parties sharply disagree over whether this correlation indicates sufficient "control" of the dealers to avoid the holding of Illinois Brick. Nonetheless, as stated earlier, we do not reach this issue. In analyzing the significance of the retail pricing data, we think it sufficient to note that, regardless of the specific degree of control over individual stations, movements in the appellees' wholesale prices generally influenced the retail prices that were charged by the dealers. The parties do not dispute this latter fact
 
 
 [4]
 Curiously, the district court later went on to state, in apparent contradiction, that "[w]holesale prices play a major part in any decision to set retail prices, and we therefore can assume that the defendants' wholesale prices had a tendency to follow a similar pattern". 656 F.Supp. at 1300. We agree with this latter statement of the district court
 
 
 [5]
 As used here, the term "interdependent" merely describes the phenomenon of sequential competitive pricing decisions that are each made (1) in response to the ones preceding it and (2) in hope or expectation of the ones that follow it. The legal significance of such conduct is analyzed below
 
 
 [6]
 Were it necessary to do so, we would be hard-pressed to conclude that interdependent pricing is "inevitable" or "inherent" in the gasoline markets at issue in this case. Given the generally rapid deterioration in prices that followed each restoration, any interdependence in the appellees' pricing behavior was at best imperfect
 
 
 [7]
 Thus, for example, the record indicates that in mid-February 1971, Union "restored" prices to its dealers in California by withdrawing dealer discounts, but when only two other companies followed suit, it reinstated dealer aid just a few days later
 
 
 [8]
 In reaching this conclusion, we take note of the fact that the record indicates that the appellees generally learned quite rapidly of one another's price moves by reading about them in the trade press. In section III-B, infra, we consider the appellants' claim that the appellees' exchange of information through the trade press is, under the circumstances of this case, probative of a conspiracy. For purposes of the present analysis, however, we take the rapid dissemination of such pricing information as a given
 
 
 [9]
 In some cases, when a market is highly unconcentrated, parallel pricing alone may be all the proof that is required
 
 
 [10]
 The record indicates that in the 1960s Exxon issued press releases concerning its withdrawal of dealer aid, but that it stopped doing so in 1969. Nonetheless, the record also indicates that Exxon continued to respond to press inquiries concerning its price moves
 
 
 [11]
 As noted earlier, the record indicates that price increases were occasionally announced in advance of their effective date. Such announcements are, of course, even more effective in allowing the price leader to communicate its intention and to receive reactions without having to incur substantial risk
 
 
 [12]
 An inference that the parallel use of the trade press was the result of at least a tacit agreement is reasonable in light of the fact that, as noted in section III-C, infra, the use of the trade press was arguably a substitute for the direct competitor contacts that the appellees admit occurred during the period prior to the Court's decision in United States v. Container Corp., 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969)
 
 
 [13]
 Consistent with the limited nature of the holding in Container, the Court has held that agreements to exchange pricing data do not themselves constitute a per se violation of the Sherman Act. United States v. United States Gypsum Co., 438 U.S. 422, 441 n. 16, 98 S.Ct. 2864, 2875 n. 16, 57 L.Ed.2d 854 (1978). Accordingly, information exchanges help to establish an antitrust violation only when either (1) the exchange indicates the existence of an express or tacit agreement to fix or stabilize prices, or (2) the exchange is made pursuant to an express or tacit agreement that is itself a violation of Sec. 1 under a rule of reason analysis. Given Container 's conclusion that the agreement in that case fell within the per se ban against price fixing, see 393 U.S. at 337-38 & n. 4, 89 S.Ct. at 512-13 & n. 4 (citing United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 220-21, 60 S.Ct. 811, 842-43, 84 L.Ed. 1129 (1940)), it seems clear that Container falls into the first of these two classes. See Wilcox v. First Interstate Bank, 815 F.2d 522, 526 (9th Cir.1987) (noting that Container involved an agreement to fix prices); Hanson v. Shell Oil Co., 541 F.2d 1352, 1360 (9th Cir.1976) (characterizing Container as a case in which companies exchanged price information "for the purpose of price stabilization"), cert. denied, 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977)
 
 
 [14]
 Our conclusion would necessarily be different were the appellants' inference of a price-fixing conspiracy based on the dissemination or advertising of retail prices; permitting an inference of conspiracy from such evidence would make it more difficult for retail consumers to get the information they need to make efficient market decisions. In the district court, the appellants did indeed base their claims in part on the public announcement of retail prices by dealers, but they have not pressed such a theory on appeal
 
 
 [15]
 We also note that, as an alternative to using the price data dissemination evidence as a means of proving the existence of a per se illegal conspiracy to fix prices, the appellants on remand may also seek to challenge directly, under a rule of reason analysis, the alleged agreement to exchange price information. See note 13 supra. Given the evidence indicating a lack of a strong procompetitive purpose for such data dissemination, the appellants' evidence clearly presents a jury question under this alternative theory
 
 
 [16]
 We disagree with the appellees' suggestion that the lack of agreement is clearly indicated by the diversity of publication practices. The fact that the appellees may have chosen different methods of publication does not imply that they did not each recognize and act upon a mutual understanding that such information would somehow be made available to competitors
 
 
 [17]
 As we found with the evidence of direct competitor contacts in the pre-Container period, we also perceive no Matsushita problem in permitting an inference of conspiracy in the post-Container period for the same reasons. See Section III-C-1 supra
 
 
 [18]
 We note, however, that this evidence is direct evidence only of the limited competitor contacts specifically described. It requires an additional inference to conclude that the existence of such contacts indicates the existence of other, undisclosed competitor conversations. As noted above, we conclude that, considered in the context of the other evidence in this case, such evidence does at least support a permissible inference that a number of the appellees continued to engage in occasional competitor contacts
 
 
 [19]
 We note, however, that no independent oil company is presently a party in this action
 
 
 [20]
 During this period, Erdos was paid by Mobil for conducting surveys concerning wholesale prices in the independent market
 
 
 [21]
 We are not deciding the greater question of whether there was a conspiracy to fix prices. Nor are we deciding whether Galligan's testimony should be admitted during trial. When the lower court judge makes that decision he will not be viewing appellant's evidence from the same procedural posture. We simply are deciding the very narrow issue of whether the court can consider Galligan's testimony for the purposes of summary judgment on the discrete issue of independent dealer contacts
 
 
 [22]
 Because there is direct evidence of appellees' efforts to coordinate pricing with the independent segment of the market, the Matsushita standards for summary judgment do not apply to this evidence. McLaughlin, 849 F.2d at 1207. We simply decide whether there is a genuine issue of material fact. Tzung v. State Farm Fire and Casualty Co., 873 F.2d 1338, 1339-40 (9th Cir.1989)
 
 
 [23]
 Unlike the tankwagon price information discussed earlier, petroleum supply and demand information is important to a number of actors in the economy, and courts should hesitate to permit inferences of conspiracy based on the exchange of supply information alone. Such an inference will not have a negative deterrent effect, however, when it is based on the combination of actions and intent in this case. For example, while it might have harmful anticompetitive effects to allow an inference from the exchange of supply forecasts alone, it might not be harmful to allow that inference from supply forecasts and actions to reduce capacity and evidence of anticompetitive intent. Companies who were innocently distributing supply information would be unaffected by an antitrust rule that only prohibited the exchange of supply forecasts when accompanied by actions to reduce excess capacity and evidence of anticompetitive intent. Thus, permitting the inference in this case will not have an undue deterrent effect on the proper dissemination of petroleum supply and demand information
 
 
 [24]
 Because there is no evidence of the President's approval of the cartel's activities at issue we need not reach the question of whether it is within the powers of the executive branch to convey antitrust immunity through its acquiescence in an overseas consortium
 
 
 [25]
 Cal.Civ.Code Sec. 3370.1 has since been recodified as Cal.Bus. & Prof.Code Sec. 17206