In re CITRIC ACID LITIGATION.

This document relates to all actions.

Nos. MDL 1092 FMS, C 95–2963 FMS.

United States District Court,
N.D. California.

Jan. 23, 1998.

Kirk B. Hulett, Milberg, Weiss, Bershad, Hynes & Lerach, LLP, San Diego, CA, Leonard Barrack, Steven A. Asher, Barrack, Rodos & Bacine, Philadelphia, PA, Guido Saveri, Richard Saveri, Saveri & Saveri, San Francisco, CA, Bruce L. Simon, Nancy L. Fineman, Joseph W. Cotchett, Cotchett, Pitre & Simon, Burlingame, CA, Steven A. Kanner, Michael J. Freed, Michael Hyman, Much, Shelist, Freed, Denenberg, Ament & Eiger, PC, Chicago, IL, for 7–Up Bottling Company of Philadelphia, Inc., plaintiff.

Edward P. Sangster, Robert Brewer, Jr., McKenna & Cuneo, LLP, San Francisco, CA, Aubrey M. Daniel, III, John E. Schmidtlein, Steven R. Kuney, Williams & Connolly, Washington, DC, for Archer Daniels Midland Co., Inc., defendant.

Charles F. Preuss, Vernon I. Zvoleff, John J. Powers, Preuss, Walker & Shanagher, San Francisco, CA, Robert E. Bloch, Mark W. Ryan, Mayer, Brown & Platt, Washington, DC, for Cargill Inc, defendant.

Tefft W. Smith, Kirkland & Ellis, Chicago, IL, Daniel F. Attridge, Hunter Wiggins, Kirkland & Ellis, Washington, DC, for Haarmann & Reimer Corporation, defendant.

Mark R. Joelson, Donald C. Klawiter, Jonathan M. Rich, Morgan, Lewis & Bockius, LLP, Washington, DC, for Jungbunzlauer Inc., defendant.

Franklin R. Liss, Bruce L. Montgomery, Arnold & Porter, Washington, DC, for Hoffman–La Roche Inc, defendant.

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY
JUDGMENT

FERN M. SMITH, District Judge.

## INTRODUCTION

Defendant Cargill's motion for summary judgment requires the Court to consider whether there is a genuine issue of material fact about whether Cargill participated in a conspiracy to fix the price and allocate market share of citric acid. The Court holds that no reasonable jury could find that Cargill was a participant, and so grants Cargill's motion.

## BACKGROUND

Citric acid is a corn derivative with a wide variety of uses in the manufacture of food, soft drinks, detergents, and pharmaceuticals. The citric acid market is dominated by a small number of major producers. Between 1991 and 1995, four of those producers— Haarman & Reimer ("H & R"), Hoffman LaRoche ("HLR"), Jungbunzlauer ("JBL"), and Archer Daniels Midland ("ADM")—admittedly conspired to divide the market among them and to raise the price of citric acid by limiting sales. At high-level meetings top executives known as "masters" allocated market shares to within a tenth of a percent. The masters monitored each other by exchanging their monthly sales figures over the telephone. If a conspirator had sold more than its allocation, it was required to purchase the excess from its co-conspirators. The conspiracy was implemented by lower-level corporate officials known as "Sherpas." During the time of the conspiracy, the price of citric acid rose from $0.63/lb to $0.85/lb.

After learning of the conspiracy, the Department of Justice began an investigation that culminated in criminal charges to which the four conspirators pled guilty. Several civil cases followed closely on the heels of the criminal proceedings. The four companies that had pled guilty in the criminal prosecution settled. Cargill, Inc., the fifth major producer, however, was not indicted, has not settled and now brings this motion for summary judgment, asserting that it was never a member of the conspiracy.

Defendant Cargill, a privately held company, has only become a large-scale producer of citric acid in the last decade. Cargill did not decide to enter the citric acid market until 1988, but it rapidly built both production capacity and market share. By 1990 it had

constructed a plant with an annual capacity of 56 million pounds, which it expanded first to 80 million pounds in 1992 and then to 120 million pounds by 1994. During these years, Cargill sold all the citric acid it produced. Cargill's domestic market share rose from 0% in 1990 to about 20% by the mid–1990's. Its citric acid prices generally followed those of the conspirators. During this period of rapid domestic expansion, Cargill was also investigating ways to enter the European, Asian, and Latin American markets. After considering such options as a joint venture with one of its competitors and the purchase of various manufacturing plants, and after holding various meetings with those corporations about those possibilities, Cargill eventually decided to build a new plant in Brazil.

In 1993, Cargill joined the European Citric Acid Manufacturers Association ("ECAMA"), which included as members ADM, HLR, H & R, and JBL, as well as several non-conspirator companies. ECAMA is a trade association that collects production and sales data from its members, audits the data through an independent auditor, and then releases to its members aggregate data but not company-specific information. This process is intended to allow its members to learn about the overall state of the world market without divulging secret information to each other.

In this motion, plaintiffs seek to prove that ECAMA was actually used as a front for the illegal exchange of secrets among the conspirators. They also argue that Cargill's parallel pricing and various meetings with the conspirators provide sufficient circumstantial evidence of participation in the conspiracy to avoid summary judgment. For the reasons set forth in this order, plaintiffs are wrong.

## DISCUSSION

### I. Legal Standard

#### A. Summary Judgment

To withstand a motion for summary judgment, the opposing party must set forth specific facts, admissible in evidence, showing that there is a genuine issue of material fact in dispute. *See* Fed.R.Civ.P. 56(e). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, "the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The Court does not make credibility determinations with respect to evidence offered, and is required to draw all inferences in the light most favorable to the non-moving party. *See T.W. Elec. Serv., Inc.,* 809 F.2d at 630–31 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). In doing so, however, the Court may only draw inferences "that are reasonable given the substantive law which is the foundation for the claim," *Richards v. Neilsen Freight Lines,* 810 F.2d 898, 902 (9th Cir.1987), and must not "resort[ ] to guesswork or conjecture," *The Jeanery, Inc. v. James Jeans, Inc.,* 849 F.2d 1148, 1151 (9th Cir.1988).

■ A special rule applies to the use of circumstantial evidence in antitrust cases. "[W]here an antitrust plaintiff relies entirely upon circumstantial evidence of conspiracy, a defendant will be entitled to summary judgment if it can be shown that (1) the defendant's conduct is consistent with other plausible explanations, and (2) permitting an inference of conspiracy would pose a significant deterrent to beneficial procompetitive behavior." *In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation,* 906 F.2d 432, 440 (9th Cir.1990) (*"Petroleum Products"*). If the defendant succeeds in making such a showing, "the plaintiff must come forward with other evidence that is sufficiently unambiguous and tends to exclude the possibility that the defendant acted lawfully." *Id.*

■ Plaintiffs assert that this rule does not apply to conspiracies to raise prices. The Court disagrees. The *Petroleum Products* rule is based on a reading of the Su-

preme Court's holding in *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), in which the Court refused to infer an antitrust violation from evidence of price-cutting, because "cutting prices in order to increase business is often the very essence of competition." *Id.*, 475 U.S. at 594. Although one district court from outside the Ninth Circuit has held that the rule of *Matsushita* is limited to conspiracies to reduce prices, *see In re Bulk Popcorn Antitrust Litigation*, 783 F.Supp. 1194, 1197–98 (D.Minn.1991), that is not the rule in the Ninth Circuit, for *Petroleum Products* applied *Matsushita* to a conspiracy to raise prices. *See Petroleum Products* at 436. The Court must therefore apply the *Petroleum Products* rule to this case.

### B. Sherman Act

■ Section 1 of the Sherman act prohibits "conspiracy ... in restraint of trade or commerce." 15 U.S.C. § 1. The requirements for a civil conspiracy are the same as for a criminal conspiracy. *See Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir.1988). A finding of conspiracy does not require an explicit or formal agreement. *See United States v. General Motors Corp.*, 384 U.S. 127, 142–43, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966). "It is enough if you understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do your part to further them." *Jones* at 992.

### C. Slight Evidence Rule

■ Plaintiffs assert that because the existence of a conspiracy has been proven, they need only provide "slight evidence" that defendant was a member of the conspiracy. The "slight evidence" rule, however, is a rule of criminal appellate procedure not properly applied to a motion for summary judgment. *See Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 513 F.Supp. 1100, 1169 (E.D.Pa. 1981), *aff'd in part and rev'd in part on other grounds*, 723 F.2d 238 (3d Cir.1983), *rev'd*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (rule has "no application to a district court determination of a summary judgment motion"). Plaintiffs have cited one case from this district that did apply the slight evidence rule to a defendant's motion for summary judgment in a civil antitrust case. *See U.S. Audio & Copy Corp. v. Philips Bus. Sys.*, 1983 WL 1818, *2 (N.D.Cal.) (Patel, J.). That case, however, is not binding on the Court. Nor is the opinion applicable to this case, for it failed to consider whether the use of the slight evidence rule modified the standard of proof for summary judgment motions established in Rule 56.

Moreover, the Ninth Circuit has stated that "after much reflection we are of the mind that the slight evidence rule may be of doubtful application when the issue for review concerns whether the defendant was connected with the conspiracy at all." *United States v. Dunn*, 564 F.2d 348, 357 n. 21 (9th Cir.1977). Because defendant's connection to the conspiracy is precisely the issue here, and because the Court believes that following the slight evidence rule in a summary judgment motion would be inconsistent with the summary judgment standard established by the Supreme Court, the Court holds that the slight evidence rule does not apply.

## II. Analysis

### A. Evidence That Cargill was not a Conspirator

■ Cargill offers convincing direct testimonial evidence that it was not involved in the conspiracy. Most persuasive is the testimony of Hans Hartmann, the President of H & R GmbH, who pled guilty to being a member of the conspiracy. He stated that no one from Cargill attended any of the meetings at which the conspirators allocated market share, (Decl. of Steven C. Keller Ex. 6 ("Pls.' Ex.") at 275–76), and that he never received sales figures from Cargill (*Id.* at 202). When asked whom he meant by "the conspirators," he listed JBL, HLR, ADM, and H & R, and did not mention Cargill. (*Id.*) He also referred to the conspirators as a "group of four." (*Id.* at 71–72.) In addition, all Cargill employees who were deposed denied that Cargill was involved in a price-fixing conspiracy. (Def.'s Mem. in Supp. of Mot. for Summ. J. ("Def.'s Mem.") at 12.)

It is also significant that there is no direct evidence that Cargill was involved in the conspiracy. Under normal circumstances no inference can be drawn from the lack of direct evidence for, as many cases note, direct evidence of a conspiracy is rare. "[S]olemnized covenants to conspire are difficult to come by in any price fixing case." *In re Plywood Antitrust Litigation,* 655 F.2d 627, 633 (5th Cir.1981). This case is different. There was abundant direct evidence of a conspiracy among four companies: H & R, HLR, JBL, and ADM. In fact, all four companies pled guilty to criminal charges and have been sentenced. None now have any reason to shield Cargill. The utter lack of any direct evidence that Cargill was involved in that conspiracy is therefore quite probative.

### B. Lack of Evidence That Cargill Was a Conspirator

In contrast to the strong evidence suggesting that Cargill was not involved in price fixing, plaintiffs' evidence is insufficient to create a genuine issue of material fact. Apparently hoping that quantity will substitute for quality, plaintiffs have submitted voluminous but weak circumstantial evidence that they argue indicates that Cargill was a member of the conspiracy. Although the Court will discuss this purported evidence piece by piece, it is mindful that it must weigh the evidence as a whole, "without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 699, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962).

### 1. Parallel Pricing

■ In an industry dominated by a few major players, parallel pricing, by itself, is generally insufficient to prove an antitrust conspiracy. *See Petroleum Products,* 906 F.2d at 444–45.[1] This presumption is based on the recognition that interdependent pricing is a common feature of concentrated markets, and on the concern that allowing conspiracy to be found solely on the basis of parallel pricing would deter legitimate pricing decisions. *See id.* at 443–35. Although the parties in this case agree that Cargill's prices tracked those of the conspirators, two circumstances make it particularly difficult to draw any inference of collusion from that pricing evidence. First, the citric acid market is highly concentrated. Second, Cargill has presented evidence that at the time that it was raising its prices in parallel with the rest of the industry, it was producing at full capacity and selling all that it produced. (App. to Cargill's Mot. for Summ. J. ("Def's App.") 1 at 377.) Under those circumstances, undercutting its competitors would have been economically irrational, for Cargill, with nothing left to sell, could not have increased its market share. Likewise, Cargill's sales and marketing plans for 1992 and 1993, which stated that Cargill would follow any price increases by competitors', (Pls.' Ex. 101, 107), are not evidence of conspiratorial behavior, but simply normal business practice for a corporation selling all its production in a concentrated commodity market.[2]

### 2. Membership in ECAMA

■ Plaintiffs argue that Cargill's membership in ECAMA is evidence that it was a member of the conspiracy. According to plaintiffs' theory, the conspirators used ECAMA to monitor each others' market shares and make sure no one was "cheating" on their secret agreement. Plaintiffs assert that Cargill was fully aware of ECAMA's role in the conspiracy, and joined the organization not for any legitimate business purpose, but rather to provide the conspirators with business information that would reassure them that Cargill was not attempting to

---

**1.** "In some cases, when a market is highly unconcentrated, parallel pricing alone may be all the proof that is required." *Id.* at 445 n. 9. Plaintiffs misquote this sentence, asserting that parallel pricing is all that is required when a market is highly *concentrated.* (Pls.' Mem. in Opp. at 25.) Such an egregious error on a central point of law diminishes plaintiffs' credibility and borders on a violation of Federal Rule of Civil Procedure 11(b)(2).

**2.** Plaintiffs' quotations from the sales reports of Fritz Gruber, Cargill's national sales manager, must rationally be interpreted the same way.

increase its market share by undercutting prices.

The evidence in no way supports plaintiffs' conspiracy theory about ECAMA. Plaintiffs have not produced any admissible evidence that ECAMA was "a sham and nothing but a pretext to monitor the conspiracy." (Pls.' Mem. in Opp. to Mot. for Summ.J. ("Pls.' Mem.") at 11.) They rely primarily upon a 1995 affidavit executed by FBI agent Brian D. Shepard to obtain a search warrant to search the corporate headquarters of ADM. The affidavit, however, is inadmissible hearsay because it reports what agent Shepard said the cooperating witness said Terry Wilson said; the Court cannot consider inadmissible evidence in a summary judgment motion. *See Hollingsworth Solderless Terminal Co. v. Turley,* 622 F.2d 1324, 1335 n. 9 (9th Cir.1980).[3]

Plaintiffs also point to a phrase in the handwritten notes of an ADM employee from an ECAMA meeting. (Pls.' Ex. 105.) The four pages of notes mostly relate to China's production of citric acid. On page three the notes list three requirements for a finding of "dumping," an illegal trade practice that ECAMA members believed China was engaging in: "1) export price below normal value ... 2) must cause injury ... and 3) must prove injury was caused by dumping." Then a line is drawn across the page. Below that is written, "Undertaking is a confidential agreement to maintain price. Producers must police." In their opposition brief plaintiffs imply that this is an explicit reference to the conspiracy. (*See* Pls.' Mem. at 24.) From the context of the notes, however, this phrase does not appear to be a smoking gun proving ECAMA's involvement in the conspiracy, but simply a small part of an abstract discussion of what generally constitutes illegal trade practices.

Plaintiffs also point to a Cargill memorandum that describes the content of an ECA-MA meeting it attended on December 20, 1994. The memorandum states that there was "[a] long debate devoted to prices and volumes. All figures at hand inconsistent. Conclusion was that only real prices could be compiled if members were willing to give real prices." (Pls.' Ex. 186.) Again, from the remainder of the memorandum, it is apparent that this "debate about prices" occurred in the context of a discussion of anti-dumping measures. Moreover, Cornelia Johanna van Dijk, the Cargill employee who wrote the memorandum, testified at her deposition that she recalled the "debate," and that instead it related to a "questionnaire that had to be filled out ... and it was no discussion on prices." (Def.'s App. 49 at 49.) This testimony is consistent with the memorandum, which concludes, "Jack if you wish I can fax you the questionaire that has to be filled out." (Pls.' Ex. 186.) The memorandum thus does not support a rational inference that ECAMA was a front for the improper exchange of citric acid price information.

On the other side of the ledger is the sworn testimony of Hans Hartmann. He stated that price fixing and market allocation were never discussed at the ECAMA meetings he attended, and that the conspirators' exchange of information regarding sales volume was "completely separate" from "the information that was provided and compiled ... through ECAMA." (Def's App. 44 at 277–278.) Based on this evidence, the Court holds that no reasonable juror could find that ECAMA was used as a pretext for the improper exchange of information.

Given the conclusion that ECAMA was a legitimate trade association, the Court cannot draw any inference of conspiracy from Cargill's active participation in the organization, nor from the alleged fact that Cargill was recruited to join by the conspirators. Nor have plaintiffs provided any evidence sug-

---

**3.** Even if the Court could consider the affidavit, it provides evidence about ECAMA's role that is ambiguous at best. Although the affidavit states that Wilson provided information "about how the citric acid producers used a trade association as a pretext for improper communications concerning pricing and sales volumes," it also states that Wilson said that "the volumes are shared every month, not by ECAMA, but through another method that we have." (Pls .' Ex. 3.) The affidavit thus supports Cargill's contention that although ECAMA meetings provided convenient opportunities for the conspirators to meet privately, ECAMA's data aggregation process was not how sales volumes were shared.

gesting that Cargill believed ECAMA to be a monitoring tool for the conspirators.

It is true that ECAMA provided the conspirators with audited information about the overall size of the citric acid market, information that each individual conspirator could then use to determine whether it had the market share to which it was entitled under the conspiracy. That function of providing generic market information, however, is legitimate; allowing the aggregation of company data through a legitimate group such as ECAMA to be used as evidence of conspiratorial behavior would significantly deter membership in trade associations. Under *Petroleum Products*, such an inference is therefore improper, if Cargill can show a legitimate reason for its membership in ECAMA. *See Petroleum Products*, 906 F.2d at 440.

Despite plaintiffs' argument to the contrary, Cargill has shown that it had good business reasons for joining ECAMA. According to a contemporaneous memo written by a Cargill employee, Cargill expected to benefit from ECAMA membership by obtaining "a more accurate picture" of the state of the world market, which was necessary given their global expansion plans, and by being informed about ECAMA's research on new applications for citric acid. (Def's App. 11 at 360–61.) Cargill did recognize that when it first reported its data to ECAMA, its competitors would be able to learn specific information about Cargill by comparing the market totals from before and after it joined; it believed, however, that that effect would last only for the "first several months," (*id.*), a belief that seems quite reasonable given Cargill's rapid growth up to that time. Because Cargill has provided a convincing explanation for its decision to provide its sales data to ECAMA, it would be improper to infer conspiracy from Cargill's membership, given the deterrent effect such a ruling would have on the legitimate activities of trade associations.

In sum, plaintiffs are urging the Court to peer through a triple lens of speculation: to speculate that ECAMA was a monitoring tool for the conspiracy, to speculate that Cargill knew that, and to speculate that Cargill joined in order to reassure the conspirators that it would not disrupt the conspiracy. The evidence for each link in the chain is weak at best. Drawing an inference of participation in conspiracy on the basis of this evidence would be wholly improper for any rational trier of fact.

### 3. Business Meetings with Conspirators

In their opposition brief, plaintiffs refer to eighteen meetings that took place between Cargill and various members of the conspiracy between 1991 and 1995. (*See generally* Def.'s App. 60.) Plaintiffs offer three theories for why these meetings show that Cargill was a member of the conspiracy. They argue that the meetings must be considered direct evidence of conspiracy, that prices were improperly discussed at the meetings, and that the meetings provided an opportunity to conspire. The Court rejects each of these theories.

#### a. Meetings as Direct Evidence

At oral argument, plaintiffs asserted that the meetings between Cargill and its competitors could be considered direct evidence of conspiracy, making *Matsushita* inapposite. *See Petroleum Products*, 906 F.2d at 440–41 ("the *Matsushita* standards do not apply when the plaintiff has offered direct evidence of conspiracy"). As support for the proposition that evidence of a meeting between conspirators should be considered direct, rather than circumstantial, evidence of a conspiracy, plaintiffs rely on *Arnold Pontiac–GMC v. Budd Baer, Inc.*, 826 F.2d 1335 (3rd Cir.1987). Their reliance is misplaced. The direct evidence in that case was not the mere fact that the conspirators met, but rather the fact that at the meeting they explicitly agreed to work together to exclude the plaintiff from the relevant market. *See id.* at 1336. Although Cargill met with the conspirators in this case, there is no evidence that conspiratorial action was ever discussed at those meetings. *Arnold Pontiac* is thus inapposite. The meetings can only be considered circumstantial evidence of conspiracy.

### b. Discussion of Prices

██ Plaintiffs point to four occasions on which Cargill employees discussed citric acid prices with the conspirators as evidence that they were colluding to set prices. Although the exchange of confidential information about specific sales to specific customers can be evidence of anticompetitive behavior, *see United States v. Container Corp. of America,* 393 U.S. 333, 334–37, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969), the exchange of publicly available information does not support an inference of conspiracy. *See Wilcox v. First Interstate Bank of Oregon,* 815 F.2d 522, 526 (9th Cir.1987). Some of the price information exchanged in this case was already public knowledge. By the time an HLR employee mentioned at an April 17, 1991 meeting with Cargill that the price of citric acid was $0.68/lb (Pls.' Ex. 90, 150), both Cargill and HLR had already informed their customers of that price (Def's App. 52, 56); because each company had already set that price, the statement does not tend to show that the parties used their meeting to collusively arrive at it. Similarly, by the time Cargill informed H & R of its price increase to $0.82/lb at a meeting on September 16, 1992 (Pls.' Ex. 163 at 666), it had already announced that price increase to its customers (Def's App. 51). Moreover, Cargill employee Paul Conway, who was present at the meeting, testified at his deposition that although he did not recall stating that Cargill was increasing its price to $0.82, "If I knew of any price, it was something that was already publicly available." (Dep. of Paul Conway, Def.'s App. 46, at 43.)

Other mentions of price were innocuous for different reasons. A letter from ADM to Cargill informing them of a price increase appears to relate to a particular sale from ADM to Cargill, not to the ADM's general list price. (*See* Pls.' Ex. 91.) The negotiation of a price in the course of a swap agreement between Cargill and JBL was done, according to Cargill, because it was required by United State transfer pricing law. (Def's App. 42, at 123–25.) With regard to all of these meetings, the fact that Cargill discussed prices does not necessarily mean that it agreed to fix prices, or that it

improperly exchanged price information. These meetings are circumstantial evidence that is weak at best; they do not support a rational inference that the Cargill was a member of the conspiracy.

### c. Opportunities to Conspire

██ Finally, plaintiffs argue that Cargill's meetings with the conspirators provided opportunities to conspire, and thus are a "plus factor" supporting an inference of conspiracy. Where cooperation is necessary for a legitimate business purpose, the mere opportunity to conspire at business meetings is insufficient to support an inference of conspiracy. *See Wilcox,* 815 F.2d at 527. In evaluating plaintiffs evidence, the Court notes first that one of the disputed meetings took place in 1990, before the admitted conspiracy among the ADM, HLR, H & R, and JBL had even begun. Cargill asserts that this meeting, as well as all the others, were conducted for proper, non-conspiratorial, purposes. Specifically, it asserts that its two meetings with HLR in 1991 and its · two meetings with JBL in June 1994 related to Cargill's potential acquisition of citric acid plants. (Def's App. 60.) Cargill argues that at its September 1992 meeting with H & R, the corporations discussed the possible sale of glucose to H & R. (*Id.*) Cargill has thus adequately rebutted this "opportunity" plus factor. Moreover, these meetings have even less probative value when viewed in light of the way the conspiracy admittedly functioned. When H & R, HLR, JBL, and ADM decided to fix prices, they did so by meetings among the "masters" exclusively devoted to price fixing. Cargill was never present at those meetings. Hans Hartmann's deposition does not indicate that the conspirators used legitimate meetings as a front for discussions of price fixing. Nor do plaintiffs even argue that the disputed meetings were attended by the "masters" or the "Sherpas," the only officials at the conspirator corporations who knew about the price-fixing scheme.

### 4. Notice of Competitors' Price Increases

Plaintiffs assert that Cargill had advance notice of the conspirators' price increases.

Although such advance notice would tend to support an inference of conspiracy,[4] the evidence presented in this case does not suggest that Cargill in fact had advance notice. Plaintiffs point the Court to pricing announcements of the conspirators which were found among Cargill's records, and to Cargill pricing announcements which were found in the conspirators' records. (Pls.' Ex. 111–41.) These pricing announcements were apparently sent to customers. Based on their date stamps, they were received by the competitor corporations only after they had been mailed to customers. For example, the H & R pricing announcement in Plaintiffs' Exhibit 111 was mailed to customers on February 24, 1992; it was faxed to Cargill on March 2, 1992. The Court can find no document that appears to have been sent to the competitor corporation first.

The document that comes the closest is plaintiffs' exhibit 113, an ADM price announcement letter that was faxed from one Cargill facility to another on March 13, 1992, which is the same date that appears on the announcement. Plaintiffs argued at the hearing that this letter could not possibly have reached Cargill on the same day it was sent to ADM's customers unless ADM faxed it directly to Cargill. That is a speculative conclusion. Nothing on the fax indicates how Cargill received the letter. The letter may well have been faxed to Cargill from one of its customers, who may have received it from ADM by fax.

There is in fact evidence that Cargill's customers sent it copies of price increases that had been announced by Cargill's competitors. (See Def's App. 41 at 233 (deposition testimony of Cargill employee Robert Simpson that "generally if a customer referred to a price announcement, we would ask them to fax it to us.").) The attempt to glean from customers market information about competitors is proper competitive behavior. Holding it to be evidence of antitrust

violation would significantly deter such behavior, in violation of *Petroleum Products.*

### 5. Failure to Expand Capacity as Much as Planned

■ Plaintiffs argue that Cargill's decision to expand its capacity less than originally planned indicates that it was accommodating the cartel by restraining production. After announcing plans in March 1992 to expand its production capacity from 80 to 160 million pounds per year, in October 1992 Cargill chose instead to expand its plant to 120 million pounds. It is impossible to draw an inference of conspiracy from this evidence. Over the time period in question, Cargill was not reducing its production, or even holding it steady. Instead, it was increasing production by half. Moreover, an internal Cargill report from October 1992 documents several business reasons for the slower expansion. Cargill was concerned that the switch to liquid extraction technology could decrease product quality and alienate customers, and that the increase in production could drive down prices (although the impact was not expected to be "serious"). (Def's App. 21 at 257–59.) Given these circumstances, no reasonable juror could conclude that Cargill's business decisions were evidence that they were participating in the conspiracy.

### 6. Flat Market Share

■ In a related vein, plaintiffs allege that Cargill's market share, after growing rapidly between 1990 and 1993, remained flat between 1993 and 1995. The evidence, though not entirely clear on this point, belies plaintiffs' claim. According to Cargill's internal documents, its North American market share grew from 18.7% in 1993 to 21.0% in 1994. (Def.'s App. 27, at 5.)[5] Moreover, Ernest Micek, a Cargill employee, testified that Cargill's market share "grew annually."

---

4. The Court states that proposition as a matter of logic, rather than of Ninth Circuit law, for plaintiffs cited no Ninth Circuit decision in this section of their brief. The one case they erroneously asserted to be from the Ninth Circuit is in fact from the Eighth Circuit. *See ES Development, Inc. v. RWM Enterprises, Inc.,* 939 F.2d 547, 554 (8th Cir.1991). (Plaintiffs did, however, cite the

case correctly in their table of authorities, if not in the body of their memorandum.)

5. Cargill's market share in the rest of the world was negligible. The document does not give market share for 1995.

(Def.'s App. 1 at 377.) Plaintiffs assert that Cargill's market share was 22% in 1993, and 21% in 1994 and 1995. As evidence, plaintiffs cite to well over 100 pages of Cargill strategic reports in which the Court is unable to find any clear statement of Cargill's market share. (Pls.' Ex. 92–95.)[6] The evidence thus indicates that although the growth rate of Cargill's market share slowed during the years of the conspiracy, the share nevertheless increased more than two percent between 1993 and 1995. During this time, the conspirators were allocating market share to within a tenth of a percent. It is impossible to draw an inference of conspiracy from Cargill's market share when it changed so much more than would have been allowed had it been participating in the conspiracy.

### 7. Fifth Amendment Invocations of Conspirators[7]

 Plaintiffs seek to introduce evidence of numerous Fifth Amendment invocations by the conspirators. Such invocations are admissible in a civil case as long as they are relevant and not otherwise barred by the rules of evidence. *See FDIC v. Fidelity & Deposit Co. of Maryland,* 45 F.3d 969, 977 (5th Cir.1995). The Court holds that the depositions are not relevant to this case. When asked whether Cargill was involved in the conspiracy, numerous conspirators invoked their Fifth Amendment right against self-incrimination, doing so for every single question asked. Plaintiffs assert that the conspirators would have exonerated Cargill if they could have done so truthfully, for doing so would have reduced the amount of antitrust injury suffered by the plaintiff class, thus lessening the possible scope of their joint and several treble damage liability. (Pls.' Req. for Jud. Notice of Fifth Amend-

ment Dep. at 6 n. 9.) That is pure speculation and lacks logical support.

Many of the questions in the deposition were phrased in a way that made it impossible for the deponents to exonerate Cargill without acknowledging the existence of a conspiracy. For example, one deponent was asked whether "a representative of Haarmann & Reimer participated in meetings with representatives of other defendants, including Cargill, and agreed to fix, maintain the price of citric acid in the United States and around the world?" (Pls.' Reg. for Jud. Notice, Ex. 1.) The only inference the Court can draw from the deponent's invocation of the Fifth Amendment in response to that question is that the deponent was refusing to address whether Haarman & Reimer participated in a conspiracy. Although some of the other questions involved Cargill only, the deponents could not have answered those questions, even if they believed Cargill innocent, without appearing to be hiding something in the questions they had refused to answer. Once a party invokes the Fifth Amendment for any question, it is its right to invoke it for all questions.[8] For that reason, no inference that Cargill conspired can fairly be drawn from these depositions.

### C. Summary

Even drawing all inferences in plaintiffs' favor, as the Court must,: the evidence in this case fails to raise any genuine issue of fact that defendant Cargill was a member of the conspiracy to fix citric acid prices. Drawing an inference of conspiracy from the evidence proffered by plaintiffs would require the sort of speculation and guesswork that the Court is forbidden to undertake.

---

6. *See Schneider v. TRW, Inc.,* 938 F.2d 986, 990 n. 2 (9th Cir.1991) ("[A] district court is under no obligation to mine the full record for triable issues of fact."); Schwarzer, *et al., The Analysis and Decision of Summary Judgment Motions,* 139 F.R.D. 441, 480–481 ("[T]he opposing party should specifically identify the portions of the record relied on to enable the court to readily find them.")

7. Plaintiffs' filing a separate motion on the Fifth Amendment issue is a transparent attempt to

evade the thirty-three page limit the Court set for their opposition brief. Nevertheless, the Court will consider plaintiffs' argument on this point.

8. Counsel for Mark Witacre made exactly this point during a deposition, explaining that "I've got to ask my client to even take the fifth on his name because once you take the fifth, you have to invoke the fifth throughout the whole proceeding." (Pls.' Req. for Jud. Notice, Ex. 15, at 7.)

## CONCLUSION

Because no reasonable jury could, on the basis of this record, conclude that defendant Cargill was a member of the conspiracy, the Court GRANTS defendant's motion for summary judgment. Judgment will be entered in accordance with this order.

SO ORDERED.